IN THE SUPREME COURT OF NORTH CAROLINA

No. 109PA22-2

Filed 31 January 2025

DUSTIN MICHAEL MCKINNEY, GEORGE JERMEY MCKINNEY, and JAMES ROBERT TATE; and STATE OF NORTH CAROLINA, intervenor

v.

GARY SCOTT GOINS and THE GASTON COUNTY BOARD OF EDUCATION

Appeal pursuant to N.C.G.S. § 7A-30(2) (2023) from the decision of a divided panel of the Court of Appeals, 290 N.C. App. 403, 892 S.E.2d 460 (2023), reversing an order entered on 20 December 2021, in Superior Court, Wake County, by a three-judge panel under N.C.G.S. § 1-267.1 (2021), and remanding the case. Heard in the Supreme Court on 18 September 2024.

*Lanier Law Group, P.A., by Robert O. Jenkins, Lisa Lanier, and Donald S. Higley II, for plaintiff-appellees.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Elizabeth L. Troutman, Robert J. King III, Jill R. Wilson, and Lindsey Barber, for defendant-appellant Gaston County Board of Education.*

*No brief for defendant-appellee Gary Scott Goins.*

*Jeff Jackson, Attorney General, by Ryan Y. Park, Solicitor General, Nicholas S. Brod, Deputy Solicitor General, and Orlando L. Rodriguez, Special Deputy Attorney General, for intervenor-appellee State of North Carolina.*

*Tharrington Smith, L.L.P., by Stephen G. Rawson and Deborah R. Stagner; and Christine Scheef for North Carolina School Boards Association, amicus curiae.*

*Hedrick Gardner Kincheloe & Garofalo LLP, by M. Duane Jones, for the North Carolina Association of Defense Attorneys, amicus curiae.*

*Shook, Hardy & Bacon L.L.P., by Caroline Gieser, for American Tort Reform Association and American Property Casualty Insurance Association, amici curiae.*

*Troutman Pepper Hamilton Sanders LLP, by Mary K. Grob, for Roman Catholic Diocese of Charlotte, amicus curiae.*

*Nelson Mullins Riley & Scarborough, LLP, by Lorin J. Lapidus, G. Gray Wilson, Denise M. Gunter, and Martin M. Warf; and Bell, Davis & Pitt, P.A., by Kevin G. Williams, for Young Men's Christian Association of Northwest North Carolina d/b/a Kernersville Family YMCA, amicus curiae.*

*Wilder Pantazis Law Group, by Sam McGee, for CHILD USA, amicus curiae.*

*Fox Rothschild LLP, by Troy D. Shelton, for Jane Does 1 and 2, amici curiae.*

NEWBY, Chief Justice.

This case asks whether our state constitution limits the legislature's authority to revive previously expired tort claims by retroactively altering the applicable statute of limitations. In other words, does the expiration of a tort claim's statute of limitations create a constitutionally protected vested right?

In 2019, the General Assembly unanimously passed the SAFE Child Act, a law that allowed victims of child sexual abuse to file otherwise time-barred lawsuits during a two-year period from January 2020 to December 2021.[1] Defendant, the

---

[1] We address other aspects of the SAFE Child Act in a pair of cases released with this one. *See Cohane v. Home Missioners of Am.*, No. 278A23 (N.C. Jan. 31, 2025) (answering questions of statutory interpretation); *Doe 1K v. Roman Cath. Diocese*, Nos. 167PA22 & 168PA22 (N.C. Jan. 31, 2025) (considering the effect of res judicata).

Gaston County Board of Education,[2] contends that this revival window unlawfully interfered with constitutionally protected vested rights in violation of our state constitution's Law of the Land Clause. *See* N.C. Const. art. I, § 19. The lead opinion at the Court of Appeals rejected defendant's argument.[3] *McKinney v. Goins*, 290 N.C. App. 403, 432, 892 S.E.2d 460, 480 (2023). It reached that conclusion by applying this Court's longstanding approach to constitutional questions, which begins with a presumption of the act's constitutionality and then considers "the text of the constitution, the historical context in which the people of North Carolina adopted the applicable constitutional provision, and our precedents." *Id.* at 412–13, 892 S.E.2d at 468 (quoting *State ex rel. McCrory v. Berger*, 368 N.C. 633, 639, 781 S.E.2d 248, 252 (2016)). Because we hold that there is no constitutionally protected vested right in the running of a tort claim's statute of limitations, we affirm the decision of the Court of Appeals as modified.

## I. Background and Procedural History

Plaintiffs are three former East Gaston High School students who competed on the school's wrestling team during the mid-1990s and early 2000s. Their coach,

---

[2] On 25 March 2022, plaintiffs voluntarily dismissed their claims against defendant Gary Scott Goins without prejudice. He is currently serving a prison sentence related to the abuse plaintiffs allege in this lawsuit.

[3] We refer to the court's opinion as the "lead opinion" because only the authoring judge joined it. *See McKinney*, 290 N.C. App. at 403, 892 S.E.2d at 480 (opinion of Riggs, J.). One judge concurred in the result only but declined to write separately, *see id.* at 432, 892 S.E.2d at 480 (Gore, J., concurring in the result only without separate opinion), and one judge dissented, *see id.* (Carpenter, J., dissenting).

Gary Scott Goins, repeatedly subjected them to sexual abuse, physical violence, and psychological harm. *See generally State v. Goins*, 244 N.C. App. 499, 501–11, 781 S.E.2d 45, 48–54 (2015) (describing the evidence presented at Goins's criminal trial). These acts led to Goins's criminal prosecution and conviction in 2014. He was sentenced to more than thirty-four years in prison, a judgment the Court of Appeals later upheld. *Id.* at 511, 528, 781 S.E.2d at 54, 64.

Plaintiffs now seek civil damages from defendant, Goins's former employer, whom they contend knew or should have known about the abuse. At the time of the abuse, our State imposed a three-year statute of limitations on most tort claims, including those filed by victims of child sexual abuse. *See* N.C.G.S. § 1-52 (2019). The three-year clock began running on the victim's eighteenth birthday. N.C.G.S. § 1-17(a) (2019). Consequently, once victims turned twenty-one, the law essentially prohibited them from holding their abusers civilly liable. The claims in this case therefore would have expired no later than 2008, when the youngest of the three plaintiffs turned twenty-one.

In 2019, however, the General Assembly unanimously passed the SAFE Child Act—legislation intended to "strengthen and modernize" North Carolina's protections for victims of child sexual abuse. *See* An Act to Protect Children From Sexual Abuse and to Strengthen and Modernize Sexual Assault Laws (SAFE Child Act), S.L. 2019-245, 2019 N.C. Sess. Laws 1231. Among other noteworthy changes, the Act purported to revive certain time-barred claims. The relevant portion of the statute,

section 4.2(b), provides:

> Effective from January 1, 2020, until December 31, 2021, this section revives any civil action for child sexual abuse otherwise time-barred under [N.C.]G.S. [§] 1-52 as it existed immediately before the enactment of this act.

*Id.* § 4.2(b).

Relying on this provision, plaintiffs sued Goins and defendant on 2 November 2020, bringing tort claims for assault and battery; negligent hiring, retention, and supervision; negligent and intentional infliction of emotional distress; constructive fraud; and false imprisonment. Defendant answered and counterclaimed, seeking a declaratory judgment that section 4.2(b) was facially unconstitutional. It later filed a separate motion to dismiss on the same ground and, in a joint motion with plaintiffs, sought to transfer the constitutional challenge to a three-judge panel of the Superior Court, Wake County. *See* N.C.G.S. § 1-267.1(a1) (2021) ("[A]ny facial challenge to the validity of an act of the General Assembly shall be transferred . . . to the Superior Court of Wake County and shall be heard and determined by a three-judge panel of the Superior Court of Wake County . . . ."). The trial court granted the motion to transfer on 17 May 2021.

The State then filed for and was granted permission to intervene to defend section 4.2(b)'s constitutionality. On 20 December 2021, a divided superior court panel issued a written order declaring section 4.2(b) facially unconstitutional. The majority based its reasoning almost entirely on its reading of this Court's "vested rights" precedents, holding that defendant possessed a vested right in the previously

expired statute of limitations that the legislature could not take away without violating the constitution. The dissent, however, concluded that "the text of the [c]onstitution, the historical context in which the people of North Carolina adopted the applicable constitutional provisions, and our court's unsettled law" demonstrated that section 4.2(b) was constitutional. Plaintiffs appealed the panel's order to the Court of Appeals.

At the Court of Appeals, plaintiffs argued that the relevant text, historical context, and precedents showed that section 4.2(b) did not implicate vested rights. They further argued that "[e]ven if . . . [section 4.2(b)] impacts a right deemed fundamental/vested, that does not automatically invalidate the legislation." Instead, they requested the court apply the "modern substantive due process analysis" to uphold the law. Defendant, however, contended in its response brief that section 4.2(b) impermissibly infringed upon vested rights, which it believed were absolutely immune from legislative interference. It noted that North Carolina's courts adopted substantive due process principles from the federal courts' interpretation of the Fourteenth Amendment to the Federal Constitution, but it maintained that the Court of Appeals should not apply those standards to the vested rights doctrine because the latter provided "broader protections than . . . the Federal Constitution."

Accordingly, defendant stated that "North Carolina has not adopted, and should not adopt, general [Fourteenth] Amendment standards of review in lieu of longstanding state constitutional doctrine in this context." Its position on this matter

was unequivocal:

> [Plaintiffs] contend that the strict scrutiny/rational basis analytical framework developed by the federal courts in the context of the Fourteenth Amendment must apply in the analysis of the Revival Window. *This [c]ourt should not rewrite North Carolina law to adopt this federal court approach.*
>
> While the Fourteenth Amendment to the United States Constitution and the Law of the Land Clause of the North Carolina Constitution share some of the same goals, *the language and jurisprudence are different for each. . . .*
>
> . . . .
>
> If this [c]ourt follows [plaintiffs]' proposed approach and adopts wholesale federal jurisprudence of what substantive due process means, this [c]ourt will forfeit its independence from the Supreme Court of the United States on what is and what is not a fundamental right for citizens of this State. *There is no good reason for this [c]ourt to pursue this line of reasoning*, particularly when our [S]tate has a long, robust history on this very topic under the Law of the Land Clause that can be readily analyzed to inform the decisions of this [c]ourt.

(Emphases added.)[4]

---

[4] Defendant made the same arguments and concessions to this Court. For instance, it argued the following in its opening brief:

> As the Court of Appeals dissent noted, fundamental rights and vested rights are not the same. Under federal law, fundamental rights *can* be impaired or taken away by the government under certain circumstances. Not so with vested rights, which are immune to infringement by the [l]egislature. . . .
>
> . . . .
>
> The balancing test framework of the [Fourteenth] Amendment is particularly inappropriate in the context of North Carolina's vested rights doctrine, which imposes a categorical

In issuing its decision, the Court of Appeals divided along similar lines as the superior court panel. The lead opinion acknowledged that section 4.2(b) was presumptively constitutional and that defendant would need to prove unconstitutionality beyond a reasonable doubt. *McKinney*, 290 N.C. App. at 412, 892 S.E.2d at 468 (citing *Hart v. State,* 368 N.C. 122, 131, 774 S.E.2d 281, 287 (2015)). It then rigorously examined the constitutional text, historical context, and this Court's precedents. *Id.* at 413–32, 892 S.E.2d at 468–80. This analysis led it to reject the central premise of defendant's argument: that section 4.2(b) impermissibly infringed upon vested rights, which were absolutely immune from legislative interference. Instead, the lead opinion explained that the statute did not affect vested rights at all: "[A] procedural bar to a plaintiff's claim imposed by an expired statute of limitations does not, standing alone, create any property right in the defendant, and said bar may be retroactively lifted without interfering with a defendant's vested rights." *Id.* at 418, 892 S.E.2d at 472 (citing *Hinton v. Hinton,* 61 N.C. (Phil.) 410, 415–16 (1868)). The court therefore held that defendant "failed to show beyond a reasonable doubt that an express provision of [the state constitution] prohibits revivals of statutes of limitation." *Id.* at 432, 892 S.E.2d at 480 (citing *Harper v. Hall*, 384 N.C. 292, 324, 886 S.E.2d 393, 414–15 (2023)).

---

restraint on the [l]egislature. Adopting the federal balancing test would result in the reversal of hundreds of years of jurisprudence in this [S]tate.

Despite having rejected the entire basis for defendant's argument, the lead opinion concluded by also considering whether section 4.2(b) "violate[d] constitutional due process under the present law of this State, i.e., the modern substantive due process analysis." *Id.* at 428, 892 S.E.2d at 478 (italics omitted). It decided the statute passed this secondary test as well, because it satisfied "even the highest level of constitutional scrutiny." *Id.* at 432, 892 S.E.2d at 480.

On the other hand, the dissent at the Court of Appeals believed that the running of the statute of limitations created a procedural bar in which defendant had a vested right. *Id.* at 434–35, 892 S.E.2d at 482 (Carpenter, J., dissenting). The dissent recognized that the constitution lacked a textual provision prohibiting the revival window at issue here. *Id.* at 432, 892 S.E.2d at 481. Its review of this Court's precedents, however, led it to conclude that the constitution prohibited the General Assembly from interfering with vested rights under any circumstances. *Id.* The dissent also opined that the lead opinion's substantive due process analysis "would erase our [State's] vested-rights doctrine." *Id.* at 441, 892 S.E.2d at 486. It noted that vested rights were a distinct part of the State's constitutional law and called them "ill-suited" for review under the federal due process standards they predated. *Id.* Defendant appealed to this Court on the basis of the dissent. N.C.G.S. § 7A-30(2) (2023).

## II. Fundamental Principles

The question for this Court is whether our state constitution prohibits the

legislature from reviving otherwise time-barred tort claims. In other words, does the running of a statute of limitations in a tort claim create a constitutionally protected vested right?

"A frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty." N.C. Const. art. I, § 35. Accordingly, we apply the fundamental approach by which this Court has decided constitutional questions for over two centuries. *See Harper*, 384 N.C. at 378–79, 886 S.E.2d at 448–49; *Cmty. Success Initiative v. Moore*, 384 N.C. 194, 212–13, 886 S.E.2d 16, 32–33 (2023); *Holmes v. Moore*, 384 N.C. 426, 435–39, 886 S.E.2d 120, 129–32 (2023).

## A. Presumption of Constitutionality

Our review presumes that legislation is constitutional and that a constitutional limitation on the General Assembly must be explicit in the text and demonstrated beyond a reasonable doubt. *See Harper*, 384 N.C. at 323, 886 S.E.2d at 414; *Cmty. Success*, 384 N.C. at 212, 886 S.E.2d at 32; *Holmes*, 384 N.C. at 435–36, 886 S.E.2d at 129. "The [l]egislature alone may determine the policy of the State, and its will is supreme, except where limited by constitutional inhibition[.] . . . But even then the courts do not undertake to say what the law ought to be; they only declare what it is." *Holmes*, 384 N.C. at 435, 886 S.E.2d at 129 (quoting *State v. Revis*, 193 N.C. 192, 195, 136 S.E. 346, 347 (1927)).

The rationale for this framework is grounded in the structure of the state constitution. Article I, Section 2 of our constitution declares that "[a]ll political power

is vested in and derived from the people; all government of right originates from the people, is founded upon their will only, and is instituted solely for the good of the whole." N.C. Const. art. I, § 2. The people exercise their inherent political power through their elected representatives in the General Assembly. *State ex rel. Ewart v. Jones*, 116 N.C. 570, 570, 21 S.E. 787, 787 (1895). We have therefore recognized that "the General Assembly serves as 'the agent of the people for enacting laws,' " giving the legislature "the presumptive[, plenary] power to act." *Harper*, 384 N.C. at 323, 886 S.E.2d at 414 (quoting *State ex rel. Martin v. Preston*, 325 N.C. 438, 448, 385 S.E.2d 473, 478 (1989)).

Moreover, Article I, Section 6 establishes that the powers of the three branches of government "shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. Like other provisions of the Declaration of Rights, the Separation of Powers Clause "is to be considered as a general statement of a broad, albeit fundamental, constitutional principle." *Harper*, 384 N.C. at 321, 886 S.E.2d at 413 (quoting *State v. Furmage*, 250 N.C. 616, 627, 109 S.E.2d 563, 571 (1959)). Later, more specific portions of the constitutional text expand on this abstract principle: Article II sets forth the legislative power; Article III, the executive; and Article IV, the judicial. *Id.* at 321–22, 886 S.E.2d at 413 (citing John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 46 (2d ed. 2013) [hereinafter *State Constitution* (2d ed.)]). The specific language used in Articles II, III, and IV confirms that the legislature, but not the executive or judicial branches, wields plenary power. "Nowhere was it stated

that the three powers or branches had to be equal. In fact, although the balance occasionally shifted, the preponderant power has always rested with the legislature." *Harper*, 384 N.C. at 322, 886 S.E.2d at 413 (quoting *State Constitution* (2d ed.) 50).

But because "[t]he people speak through the express language of their constitution, and only the people can amend it," *id.* at 297, 886 S.E.2d at 398 (citing N.C. Const. art. XIII), the General Assembly cannot exceed the express limits placed on it by the constitutional text, *id.* at 323, 886 S.E.2d at 414; *see also id.* at 297, 886 S.E.2d at 398 ("[T]he state constitution is a limitation on power."). When a legislative act goes beyond these limits, the judiciary must use its "constitutional power of judicial review" to strike it down. *Berger*, 368 N.C. at 650, 781 S.E.2d at 259 (Newby, J., concurring in part and dissenting in part); *see also Bayard v. Singleton*, 1 N.C. (Mart.) 5, 7 (1787) ("[N]o act [of the General Assembly] . . . could by any means alter or repeal the [c]onstitution."); *Cmty. Success*, 384 N.C. at 212, 886 S.E.2d at 32 ("[W]hen a challenger proves the unconstitutionality of a law beyond a reasonable doubt, this Court will not hesitate to pronounce the law unconstitutional and to vindicate whatever constitutional rights have been infringed.").

Still, we must use the power of judicial review with "great reluctance," *Bayard*, 1 N.C. (Mart.) at 6–7, resisting any temptation to intrude into the legislature's policy-making role, *see Holmes*, 384 N.C. at 439, 886 S.E.2d at 132 ("The power to invalidate legislative acts is one that must be exercised by this Court with the utmost restraint . . . ."). Our constitution makes plain that "a restriction on the General

Assembly is in fact a restriction on the people." *Berger*, 368 N.C. at 651, 781 S.E.2d at 259 (Newby, J., concurring in part and dissenting in part); *see also Cmty. Success*, 384 N.C. at 211, 886 S.E.2d at 31 (stating that acts of the General Assembly are "expressions of the people's will"). Thus, when the judiciary strikes down a duly enacted law of the General Assembly, it creates tension between the judicial and legislative branches, as well as between the judiciary and the people.

The presumption of constitutionality eases this tension. It is "a critical safeguard that preserves the delicate balance between this Court's role as the interpreter of our [c]onstitution and the legislature's role as the voice through which the people exercise their ultimate power." *Holmes*, 384 N.C. at 435, 886 S.E.2d at 129; *see also Harper*, 384 N.C. at 299, 886 S.E.2d at 399 ("[T]he people act and decide policy matters through their representatives in the General Assembly. We are designed to be a government of the people, not of the judges."); *Cmty. Success*, 384 N.C. at 211, 886 S.E.2d at 32 (stating that this Court does not strike down an act of the General Assembly "unless it violates federal law or *the supreme expression of the people's will, the North Carolina Constitution*" (emphasis added)).

The party challenging a law's constitutionality—in this case, defendant—bears the burden of overcoming our presumption of validity. *Cmty. Success*, 384 N.C. at 212, 886 S.E.2d at 32. "A facial challenge to the constitutionality of an act," like the one defendant brings here, "is the most difficult challenge to mount successfully." *Id.* (quoting *Hart*, 368 N.C. at 131, 774 S.E.2d at 288). "To succeed in this endeavor, one

who facially challenges an act of the General Assembly may not rely on mere speculation. Rather, '[a]n individual challenging the facial constitutionality of a legislative act must establish that no set of circumstances exists under which the act would be valid.' " *Holmes*, 384 N.C. at 436, 886 S.E.2d at 129 (alteration in original) (quoting *State v. Bryant*, 359 N.C. 554, 564, 614 S.E.2d 479, 486 (2005)). "The fact that a statute might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *Cmty. Success*, 384 N.C. at 213, 886 S.E.2d at 33 (quoting *State v. Thompson*, 349 N.C. 483, 491, 508 S.E.2d 277, 282 (1998)). If the challenger fails to meet his burden beyond a reasonable doubt, "we must uphold the statute regardless of whether we agree with the General Assembly's public policy choices." *Id.* at 212, 886 S.E.2d at 32.

These standards are well-settled. From the beginning, North Carolina's courts have exercised judicial review with the utmost caution, only declaring a law unconstitutional if it violated the express constitutional text. *See Bayard*, 1 N.C. (Mart.) at 6; *see also, e.g.*, *Lee v. Dunn*, 73 N.C. 595, 601 (1875) ("[I]t is for the appellant to show that the [l]egislature is restricted by the express provisions of the [c]onstitution, or by necessary implication therefrom. And this he must show beyond a reasonable doubt." (first citing *State v. Adair*, 66 N.C. 298, 303 (1872), and then citing *King v. W. & W. R.R. Co.*, 66 N.C. 277, 283 (1872))); *Daniels v. Homer*, 139 N.C. 219, 227–28, 51 S.E. 992, 995 (1905) ("[A] statute will never be held unconstitutional if there is any reasonable doubt." (quoting *State v. Lytle*, 138 N.C. 738, 741, 51 S.E.

66, 68 (1905))); *Cooper v. Berger*, 371 N.C. 799, 810–11, 822 S.E.2d 286, 296 (2018) ("Unless the [c]onstitution expressly or by necessary implication restricts the actions of the legislative branch, the General Assembly is free to implement legislation as long as that legislation does not offend some specific constitutional provision." (emphases omitted) (quoting *Baker v. Martin*, 330 N.C. 331, 338–39, 410 S.E.2d 887, 891–92 (1991))). This requirement serves as "a necessary protection against abuse of [the judicial review] power by unprincipled or undisciplined judges." *Holmes*, 384 N.C. at 439, 886 S.E.2d at 132. "Policy decisions belong to the legislative branch, not the judiciary." *Harper*, 384 N.C. at 300, 886 S.E.2d at 400.

## B. Text, Context, and Precedent

Having outlined our presumption of constitutionality, we now explain the methodology by which we evaluate a constitutional challenge. Every constitutional inquiry examines the text of the relevant provision, the historical context in which the people of North Carolina enacted it, and this Court's precedents interpreting it. *Cmty. Success*, 384 N.C. at 213, 886 S.E.2d at 33; *Berger*, 368 N.C. at 639, 781 S.E.2d at 252; *see Harper*, 384 N.C. at 323, 886 S.E.2d at 414.

We begin with the text of the applicable constitutional provision. *Cmty. Success*, 384 N.C. at 213, 886 S.E.2d at 33 ("[W]here the meaning is clear from the words used, we will not search for a meaning elsewhere." (alteration in original) (quoting *Preston*, 325 N.C. at 449, 385 S.E.2d at 479)). "The constitution is interpreted based on its plain language. The people used that plain language to express their

intended meaning of the text when they adopted it." *Harper*, 384 N.C. at 297, 886 S.E.2d at 399. Because all political power in this State derives from the people, *see* N.C. Const. art. I, §§ 2–3, the constitution contains "no hidden meanings or opaque understandings—the kind that can only be found by the most astute justice or academic," *Harper*, 384 N.C. at 297, 886 S.E.2d at 399. Axiomatically, "[t]he constitution was written to be understood by everyone, not just a select few." *Id.*

We then study the historical background against which the people enacted the constitutional text. *Cmty. Success*, 384 N.C. at 213, 886 S.E.2d at 33; *see also Harper*, 384 N.C. at 351, 886 S.E.2d at 341. Our goal here is "to isolate the provision's meaning at the time of its ratification."[5] *Cmty. Success*, 384 N.C. at 213, 886 S.E.2d at 33;

---

[5] At oral argument, defendant incorrectly framed its historical argument around our most recent constitution, enacted in 1971. But the 1971 constitution did not create the two provisions at issue in this case, the Law of the Land Clause and the Ex Post Facto Clause. Rather, the constitutional drafters largely carried them over from the 1868 constitution, which itself adapted them from the 1776 constitution. John V. Orth, *The North Carolina State Constitution* 37–38, 52–53, 56–59 (1993) [hereinafter *State Constitution*]. The modern text remains consistent with its origins in 1776. Thus, the analysis must begin with the 1776 constitution and the context in which the people adopted the provisions then. *See, e.g.*, *Harper*, 384 N.C. at 351–64, 886 S.E.2d at 431–39 (noting that "[t]he [Free Elections C]lause first appeared in the 1776 constitution," acknowledging its roots in English law, and then explaining how the Clause evolved through the 1868 and 1971 constitutions).

The historical context in which the people enacted the 1971 constitution lacks much persuasive value with respect to defendant's case. The drafters specifically stated that the new constitution "did not intend 'to bring about any fundamental change in the power of state and local government or the distribution of that power.'" *Berger*, 368 N.C. at 643, 781 S.E.2d at 254–55 (quoting N.C. State Const. Study Comm'n, *Report of the North Carolina State Constitution Study Commission* 4 (1968), https://www.ncleg.gov/Files/Library/studies/1968/st12308.pdf). Instead, the primary goal of the 1971 constitution was "editorial pruning, rearranging, rephrasing, and modest amendments," and "the great majority of the changes embraced in the [1971] constitution [took] the form of [non-substantive] deletions or contractions in language." *Id.* at 643, 781 S.E.2d at 255 (quoting *Report of the North Carolina State Constitution Study Commission* 29).

That is especially true of the minor edits made to the Law of the Land Clause and Ex Post Facto Clause. Consider the single change the 1971 constitution made to the Law of the Land Clause: the words "ought to" were replaced with "shall." *Compare* N.C. Const. of 1868, art. I, § 17, *with* N.C. Const. art. I,§ 19. It did the same to the Ex Post Facto Clause, replacing the phrases "ought to be made" and "ought to be passed" with "shall be enacted." *Compare* N.C. Const. of 1868, art. I, § 32, *with* N.C. Const. art. I, § 16. The use of "ought to" traces back to the 1776 constitution. *See* N.C. Const. of 1776, Declaration of Rights, §§ XII, XXIV. North Carolinians at the time would have viewed this language as a command to the government. *See Smith v. Campbell*, 10 N.C. (3 Hawks) 590, 598 (1825) (declaring that "ought" is synonymous with "shall" and noting that "the word ought, in this and other sections of the [1776 constitution], should be understood imperatively").

When the drafters of the 1971 constitution changed "ought to" to "shall," they were not making a substantive change. Instead, they were updating the constitution's words to ensure that its modern meaning remained consistent with how North Carolinians in 1776 and 1868 would have understood its protections. *See Report of the North Carolina State Constitution Study Commission* 74–75 ("*In order to make it clear* that the rights secured to the people by the Declaration of Rights are commands and not merely admonitions to proper conduct on the part of the government, the words 'should' and 'ought' have been changed to read 'shall' throughout the Declaration." (emphasis added)); *N.C. State Bar v. DuMont*, 304 N.C. 627, 639, 286 S.E.2d 89, 96–97 (1982) (describing an analogous edit to Article I, Section 25's jury trial right as a "minimal editorial change").

Our precedents have repeatedly cited the Commission's characterization of its edits as non-substantive. In *DuMont*, this Court noted that the *Report* "evince[d] a clear intent on the part of the framers of the new document merely to update, modernize and revise editorially the 1868 [c]onstitution." *DuMont*, 304 N.C. at 636, 286 S.E.2d at 95. The opinion continued:

> An intent to modernize the language of the existing constitution does not, in our opinion, show that the framers of the 197[1] [c]onstitution intended that instrument to enlarge upon the rights granted by the 1868 [c]onstitution. Indeed, we think that such an intent shows that the 197[1] framers intended to preserve intact all rights under the 1868 [c]onstitution.

*Id.*; *see also, e.g.*, *Sneed v. Greensboro City Bd. of Educ.*, 299 N.C. 609, 616, 264 S.E.2d 106, 112 (1980) (concluding, with respect to the substantive purpose of the 1971 constitution, that "we cannot read into the voice of the people an intent that in all likelihood had no occasion to be born").

*Harper* recognized this defining aspect of the Commission's edits as well. It explained that the 1971 constitution was "a good government measure" that "represented an attempt to modernize the 1868 constitution and its subsequent amendments with editorial and organizational revisions and amendment proposals." *Harper*, 384 N.C. at 329–30, 886 S.E.2d at 418 (first quoting *State Constitution* (2d ed.) 32; then citing *Report of the North Carolina State Constitution Study Commission* 8–12); *see also id.* at 351–52, 364–65, 368–69, 886

*see Sneed v. Greensboro City Bd. of Educ.*, 299 N.C. 609, 613, 264 S.E.2d 106, 110 (1980) ("Inquiry must be had into the history of the questioned provision and its antecedents, the conditions that existed prior to its enactment, and the purposes sought to be accomplished by its promulgation."). "We also seek guidance from any on-point precedents from this Court interpreting the provision." *Cmty. Success*, 384 N.C. at 213, 886 S.E.2d at 33 (citing *Elliott v. State Bd. of Equalization*, 203 N.C. 749, 753, 166 S.E. 918, 921 (1932)). This Court reviews constitutional questions de novo. *Id.* at 210, 886 S.E.2d at 31.

### III.    Analysis

We turn now to defendant's constitutional challenge in this case. Defendant argues that Article I, Section 19's Law of the Land Clause prohibits the General Assembly from retroactively reviving time-barred tort claims, contending that it had a "vested right" to rely on the running of the previous statute of limitations. In arguing otherwise, plaintiffs also point to another constitutional provision, the Ex Post Facto Clause of Article I, Section 16. We address these textual provisions in turn.

### A. The Law of the Land Clause

The Law of the Land Clause, found at Article I, Section 19, provides that "[n]o person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges,

---

S.E.2d at 432, 439–40, 442. Accordingly, the historical context surrounding the people's ratification of the 1971 constitution tells us very little about how they viewed the Law of the Land Clause and Ex Post Facto Clause.

or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land." N.C. Const. art. I, § 19. The Law of the Land Clause guarantees "the famous trinity of life, liberty, and property." *State Constitution* at 56. It "traces its antecedents back to the Magna Carta," *id.*, and it has existed in similar form in all three iterations of our constitution, *see* N.C. Const. art. I, § 19; N.C. Const. of 1868, art. I, § 17; N.C. Const. of 1776, Declaration of Rights, § 12.

Relevant here, we have recognized for more than two centuries that the Clause's protections apply when the State interferes with a category of property rights known as "vested rights." *See Trs. of Univ. of N.C. v. Foy*, 5 N.C. (1 Mur.) 58, 87–89 (1805); *Lake v. State Health Plan for Tchrs. & State Emps.*, 380 N.C. 502, 531–32, 869 S.E.2d 292, 315 (2022), *cert. denied*, 143 S. Ct. 111 (2022). This Court has explained that the constitution prohibits the General Assembly from retroactively disturbing or destroying vested rights.[6] *See, e.g.*, *Lester Brothers v. Pope Realty & Ins. Co.*, 250 N.C. 565, 568, 109 S.E.2d 263, 266 (1959) ("A retrospective statute, affecting or changing vested rights, is founded on unconstitutional principles and consequently void." (quoting *Bank of Pinehurst v. Derby*, 218 N.C. 653, 659, 12 S.E.2d 260, 264 (1940))).

---

[6] Of course, we have also recognized that the State may interfere with vested rights to freehold interests in real property through the use of eminent domain. *See N.C. Dep't of Transp. v. M.M. Fowler, Inc.*, 361 N.C. 1, 4, 637 S.E.2d 885, 889 (2006). Eminent domain "is inherent in sovereignty; it is not conferred by constitutions." *Id.* (quoting *State v. Core Banks Club Props., Inc.*, 275 N.C. 328, 334, 167 S.E.2d 385, 388 (1969)). The Law of the Land Clause, however, limits the exercise of eminent domain by requiring the State to justly compensate the property owner. *Id.*; *see also Johnston v. Rankin*, 70 N.C. 550, 555 (1874).

But in order for a right to be a "vested right," it must have actually vested. A vested right must be "something more than such a mere expectancy . . . based upon an anticipated continuance of the present general law." *Pinkham v. Unborn Child. of Jather Pinkham*, 227 N.C. 72, 79, 40 S.E.2d 690, 695 (1946). "Stated otherwise, [a] statute may be applied retroactively only insofar as it does not impinge upon a right which is otherwise secured, established, and immune from further legal metamorphosis." *Gardner v. Gardner*, 300 N.C. 715, 718–19, 268 S.E.2d 468, 471 (1980).

Our precedents repeatedly demonstrate that the running of the statute of limitations in a tort claim does not create a vested right.[7] "Statutes of limitations represent the legislature's determination of the point at which the right of a party to

---

[7] Two important distinctions apply here. First, a statute of limitations is not the same as a statute of repose. Unlike a statute of limitations, a statute of repose "establishes a time period in which suit must be brought *in order for the cause of action to be recognized.*" *Boudreau v. Baughman*, 322 N.C. 331, 340–41, 368 S.E.2d 849, 857 (1988) (emphasis added) (quotation omitted). "[T]he repose serves as an unyielding and absolute barrier that prevents a plaintiff's right of action even before his cause of action may accrue[.]" *Hargett v. Holland*, 337 N.C. 651, 655, 447 S.E.2d 784, 788 (1994) (quoting *Black v. Littlejohn*, 312 N.C. 626, 633, 325 S.E.2d 469, 474–75 (1985)). The running of the statute of repose forever bars the underlying claim.

Second, the running of the statute of limitations *can* affect property rights on rare occasions. For example, once an adverse possessor takes actual, open, notorious, continuous, and hostile possession of real property for the relevant statutory period, legal title passes to him from the previous owner. *See Hinman v. Cornett*, 386 N.C. 62, 65, 900 S.E.2d 872, 874 (2024); N.C.G.S. §§ 1-38(a), 40 (2023). In other words, the expiration extinguishes the property interest of one party (the previous owner) and vests it in the other (the adverse possessor). Here, however, the expiration of the statute of limitations did not destroy or modify the underlying tort liability. It merely blocked plaintiffs' ability to obtain a remedy for it. *See Hinton*, 61 N.C. (Phil.) at 415–16 (explaining this concept through a hypothetical contract debt).

pursue a claim must yield to competing interests, such as the unfairness of requiring the opposing party to defend against stale allegations." *Morris v. Rodeberg*, 385 N.C. 405, 409, 895 S.E.2d 328, 331 (2023) (citing *Ord. of R.R. Telegraphers v. Ry. Express Agency, Inc.*, 321 U.S. 342, 348–49, 64 S. Ct. 582, 586 (1944)). They are "created by the legislature, and can be removed by the legislature." *Alpha Mills v. Watertown Steam Engine Co.*, 116 N.C. 797, 804, 21 S.E. 917, 918 (1895). Perhaps most importantly, we have described them as "clearly procedural, affecting only the remedy directly and not the right to recover." *Boudreau*, 322 N.C. at 340, 368 S.E.2d at 857. Because the statute of limitations is an affirmative defense, a defendant who fails to plead it at the appropriate procedural stage waives its protections. *Overton v. Overton*, 259 N.C. 31, 36, 129 S.E.2d 593, 596–97 (1963).

These characteristics show that statutes of limitations fall outside the scope of the vested rights doctrine. This Court has explained that "a right created solely by the statute may [generally] be taken away by its repeal or by new legislation." *Pinkham*, 227 N.C. at 78, 40 S.E.2d at 694. Moreover, statutes relating to remedies or modes of procedure ordinarily "do not create new or take away vested rights." *Smith v. Mercer*, 276 N.C. 329, 338, 172 S.E.2d 489, 495 (1970). Unsurprisingly, then, our precedents have continuously rejected arguments that ordinary statutes of limitations implicate vested rights, since these statutes affect procedural remedies rather than property. *See, e.g.*, *Alpha Mills*, 116 N.C. at 804, 21 S.E. at 918; *Hinton*, 61 N.C. (Phil.) at 415 ("There is in this case no interference with vested

rights. . . . [The statute of limitations] affects the *remedy* and not the right of property.").

The distinction between property and remedies is especially important here. Some of our earliest precedents demonstrate that procedural remedies are not the sort of "property" protected by the Law of the Land Clause. As far back as 1805, this Court held in *Trustees of the University of North Carolina v. Foy* that a freehold interest in real property was a vested right. *Foy*, 5 N.C. (1 Mur.) at 87. The Court noted that if "the [l]egislature had vested an individual with the [real] property in question," the Law of the Land Clause "would restrain [it] from depriving him of such a right." *Id.* But just five years after *Foy*, this Court's decision in *Oats v. Darden* clarified that statutes prescribing remedies for vested rights violations did not themselves implicate vested rights: "[W]hen an act of [the General] Assembly takes away from a citizen a vested right, its constitutionality may be inquired into; but when it alters the remedy or mode of proceeding as to rights previously vested, it certainly, in that respect, runs in a constitutional channel." 5 N.C. (1 Mur.) 500, 501 (1810).

Several more decisions from the Founding through Reconstruction confirm that this Court's understanding of vested rights did not include civil remedies.[8] To

---

[8] *See, e.g.*, *State v. Anonymous*, 2 N.C. (1 Hayw.) 28, 28–29 (1794); *Robinson v. Barfield*, 6 N.C. (2 Mur.) 391, 422 (1818); *Harrison v. Burgess*, 8 N.C. (1 Hawks) 384, 391–92 (1821); *Scales v. Fewell*, 10 N.C. (3 Hawks) 18, 18–20 (1824); *Pratt v. Kitterell*, 15 N.C. (4 Dev.) 168, 168–71 (1833); *Battle v. Speight*, 31 N.C. (9 Ired.) 288, 292 (1848); *Green v. Cole*, 35 N.C. (13 Ired.) 425, 428 (1852); *Phillips v. Cameron*, 48 N.C. (3 Jones) 390, 392 (1856);

the contrary, these cases described the legislature's power to alter such remedies with words like "settled," *Hinton*, 61 N.C. (Phil.) at 415, and "well[-]established," *State v. Bell*, 61 N.C. (Phil.) 76, 86 (1867). Because the running of a statute of limitations in a tort claim does not create or alter a property right, it is not a vested right. The General Assembly makes policy decisions to create a statute of limitations depending on the nature of the cause of action; generally, the legislature may retroactively alter civil statutes of limitations without offending the vested rights doctrine.

The case of *Hinton v. Hinton* most clearly articulates this concept. *See Hinton*, 61 N.C. (Phil.) at 415–16. This Court decided *Hinton* in 1868, the same year our State adopted its second constitution. The case's facts reflect a tumultuous period of North Carolina's history. The Civil War and its aftermath left many North Carolinians unable to access state courts. *Id.* at 413–14. In recognition of the "extraordinary times" in which the State found itself, the postwar General Assembly enacted several laws suspending statutes of limitations and reviving time-barred actions. *Id.* at 413–15. In *Hinton*, a widow attempted to rely on one such retroactive law to claim her otherwise expired common-law right to dower. *Id.* at 412.

This Court held that the law was "unquestionabl[y]" constitutional. *Id.* at 415. Its rationale hinged on the distinction discussed above. By eliminating the statute of

---

*see also Hoke v. Henderson*, 15 N.C. (4 Dev.) 1, 17–19 (1833) (holding that a right to public office was "property" protected from retroactive interference). *But see Mial v. Ellington*, 134 N.C. 131, 162, 46 S.E. 961, 971 (1903) (overruling *Hoke*).

limitations for dower, the General Assembly affected only a remedy, "the right to a writ of dower," not the common-law property interest created by dower itself. *Id.* at 412. The interest at stake in *Hinton* was the right to bring a claim—"*a right conferred by the former statute*"—not the underlying right to the estate. *Id.* at 415. Put differently, the new statute "affect[ed] the *remedy* and not the right of property." *Id.* And as the Court acknowledged, the General Assembly possessed a "settled" power "to pass retroactive statutes affecting remedies." *Id.* Because remedies are not property, the law did not affect vested rights. *Id.*

The difference between remedies and property is subtle but meaningful. *Hinton* attempted to explain it through a hypothetical:

> Suppose a simple contract debt created in 1859. In 1862 the right of action was barred by the general statute of limitations, which did not *extinguish the debt*, but simply barred the right of action. Then comes the act of 1863, providing that the time from 20 May, 1861, shall not be counted. Can the debtor object that this deprives him of a vested right? Surely not. It only takes from him the privilege of claiming the benefit of a former statute, the operation of which is for a season suspended.

*Id.* at 415–16. In other words, a plaintiff's underlying claim exists regardless of any procedural time bars the General Assembly prescribes for bringing it. The running of the statute of limitations blocks the *plaintiff* from suing. It does not relieve the *defendant* of liability, nor does it create or alter *property* belonging to the defendant. Without an underlying property interest, there cannot be a violation of our vested rights doctrine. *Hinton* shows that there is no vested right to rely on the expiration

of a statute of limitations.

## B. The Ex Post Facto Clause

Plaintiffs suggest that another part of the constitutional text, the Ex Post Facto Clause, supports their interpretation of the Law of the Land Clause. Because "a constitution cannot violate itself," *Harper*, 384 N.C. at 374, 886 S.E.2d at 446 (quoting *Leandro v. State*, 346 N.C. 336, 352, 488 S.E.2d 249, 258 (1997)), we must construe the Law of the Land and Ex Post Facto Clauses in harmony. Upon doing so, we confirm our earlier conclusion: that the General Assembly is not prohibited from retroactively altering the statute of limitations for tort claims.

The Ex Post Facto Clause, located at Article I, Section 16, reads: "Retrospective laws, punishing acts committed before the existence of such laws and by them only declared criminal, are oppressive, unjust, and incompatible with liberty, and therefore no ex post facto law shall be enacted. No law taxing retrospectively sales, purchases, or other acts previously done shall be enacted." N.C. Const. art. I, § 16. Unlike the analogous provisions of several other state constitutions,[9] North Carolina's Ex Post Facto Clause does not prohibit all forms of retroactive laws. Rather, the plain language of our Ex Post Facto Clause only specifies two restrictions

---

[9] *See, e.g.*, N.H. Const. pt. 1, art. 23 ("Retrospective laws are highly injurious, oppressive, and unjust. No such laws, therefore, should be made, either *for the decision of civil causes*, or the punishment of offenses." (emphasis added)); Okla. Const. art. V, § 52 ("The Legislature shall have no power to revive *any right or remedy which may have become barred by lapse of time*, or by any statute of this State." (emphasis added)); Tex. Const. art. I, § 16 ("No bill of attainder, ex post facto law, *retroactive law*, or any law impairing the obligation of contracts, shall be made." (emphasis added)).

on retroactive legislation: retroactive criminal laws and retroactive tax laws. On its own, the Clause's text therefore implies that the General Assembly may enact retroactive legislation that does not fall into these two prohibited categories—that is, retroactive civil laws that do not impose taxes. *Cf. Cooper*, 371 N.C. at 810–11, 822 S.E.2d at 296 (applying the *expressio unius* canon of construction to interpret the scope of the General Assembly's power); *Harper*, 384 N.C. at 319, 886 S.E.2d at 412 (noting that the existence of a particular provision in another state's constitution shows "it is possible for [North Carolina's] constitution to provide . . . [similarly] explicit guidance" (citing *Rucho v. Common Cause*, 139 S. Ct. 2484, 2507–08 (2019))).

The history of the Ex Post Facto Clause and relevant caselaw further bolster this conclusion. The Clause first appeared in our State's 1776 constitution. At that time, it only prohibited retroactive criminal laws "punishing Facts committed before the Existence of such Laws." N.C. Const. of 1776, Declaration of Rights, § 24. Our early precedents interpreting the Clause indicate that the General Assembly was free to make changes to the law impacting civil liability. *Anonymous*, 2 N.C. (1 Hayw.) at 39 (appearing to accept an argument that the Ex Post Facto Clause "indeed prohibits the passing of a retrospective law so far as it magnifies the *criminality* of a former action" (emphasis added)). In *Anonymous*, North Carolina's Founding-era appellate court considered the constitutionality of a law authorizing the attorney general to retroactively obtain judgments against receivers of public money. *Id.* at 28–29. The Court appeared to agree with the attorney general's argument that retroactive

legislation was "frequently necessary" during the Revolution and that the 1776 constitution intentionally permitted retroactive civil laws. *Id.* at 39.

In 1867, this Court affirmed that principle by upholding a retroactive tax statute because it did not violate the express constitutional text. *Bell*, 61 N.C. (Phil.) at 78, 83. Citing the *expressio unius* canon of construction, *Bell* concluded, "The omission of any such prohibition in the [c]onstitution . . . , is a strong argument to show that retrospective laws, merely as such, were not intended to be forbidden." *Id.* at 83. Consistent with the other Founding- and Reconstruction-era caselaw cited here, this Court again acknowledged: "We know that retrospective statutes have been enforced in our courts," *id.* at 83, and the legislature has "a well[-]established right to pass a retrospective law which is not in its nature criminal," *id.* at 86.

Just one year later, North Carolina adopted its second constitution and modified the Ex Post Facto Clause, likely in response to *Bell*. The constitutional drafters kept the Clause's existing prohibition on retroactive criminal laws, but also added a new provision expressly prohibiting laws that retrospectively taxed "sales, purchases, or other acts previously done." N.C. Const. of 1868, art. I, § 32. Because the drafters only added a narrow prohibition on retroactive taxes, we can logically infer that they did not intend to bar all retroactive laws. Rather, they meant to keep the General Assembly's "settled" ability "to pass retroactive statutes affecting remedies" largely intact. *See Hinton*, 61 N.C. (Phil.) at 415. Moreover, given that *Bell*'s holding was explicitly based on *expressio unius*, *Bell*, 61 N.C. (Phil.) at 83, the

drafters would have surely had that canon in mind when crafting the updated Ex Post Facto Clause. The relative modesty of their edits is telling. Thus, the express language of the Ex Post Facto Clause, the historical context in which it was enacted, and our precedents confirm that the General Assembly may retroactively amend the statute of limitations for tort claims.

In sum, the text of the Law of the Land Clause, the historical context in which the people enacted it, and our precedents all make plain that the constitution does not prohibit the General Assembly from retroactively altering the statute of limitations for tort claims. The Clause protects, *inter alia*, vested rights in property. But the revival of an otherwise expired statute of limitations merely affects a statutory defense—a mode of procedure. It does not implicate a vested right. *See, e.g.*, *Hinton*, 61 N.C. (Phil.) at 415. Accordingly, defendant fails to demonstrate beyond a reasonable doubt that the revival of a tort claim's statute of limitations violates a constitutionally protected vested right.[10]

## C. *Wilkes County*, *Jewell*, and Dicta

Defendant contends that this Court effectively overruled *Hinton* in *Wilkes*

---

[10] Our decision, which addresses a facial constitutional challenge, does not preclude litigants from bringing as-applied challenges. *See Cmty. Success*, 384 N.C. at 213, 886 S.E.2d at 32 ("In contrast to an as-applied challenge, which represents a plaintiff's protest against how a statute was applied in the particular context in which [that] plaintiff acted or proposed to act, a facial challenge is an attack on a statute itself . . . ." (citations and quotations omitted)). When the General Assembly retroactively alters statutes of limitations to revive decades-old claims, the passage of time may prevent some parties from fairly defending against new accusations. But this would be a case-by-case determination. Section 4.2(b) is not facially unconstitutional.

*County v. Forester*, 204 N.C. 163, 167 S.E. 691 (1933). Defendant's assertion, however, relies on dicta. Read properly, *Wilkes County* does not overrule *Hinton*.

In *Wilkes County*, the county attempted to foreclose on the defendants after they failed to pay property taxes. *Id.* at 163–64, 167 S.E. at 691–92. When the defendants pointed out that the statute of limitations for bringing foreclosure actions had already passed, the county argued that a new law, enacted *after* the county brought its action, retroactively extended the time for filing. *Id.* at 166, 167 S.E. at 692–93. This Court, looking to the plain text of the new statute, disagreed. *Id.* at 166, 167 S.E. at 693 ("[W]here any action to foreclose has heretofore been instituted or brought for the collection of any tax certificate, prior to the ratification of this act, under the then existing laws, nothing herein shall prevent or prohibit the continuance and suing to completion any of said suit or suits under the laws existing at the time of institution of said action." (emphasis omitted)). Instead, it held that the previous statute of limitations governed the county's lawsuit, since the county sued before the new law went into effect. *Id.* at 168–69, 167 S.E. at 693–94.

Despite resolving the case without needing to consider the general constitutionality of retroactive laws, the opinion continued:

> Whatever may be the holdings in other jurisdictions, we think this jurisdiction is committed to the rule that an enabling statute to revive a cause of action barred by the statute of limitations is inoperative and of no avail. It cannot be resuscitated. . . . It takes away vested rights of [the] defendants and therefore is unconstitutional.

*Id.* at 170, 167 S.E. at 695 (citation omitted). According to defendant, this portion of

*Wilkes County* overruled *Hinton*. But as the Court of Appeals correctly decided, this language is nonbinding dicta. *McKinney*, 290 N.C. App. at 423, 892 S.E.2d at 474; *see also Obiter Dictum*, Black's Law Dictionary (12th ed. 2024) ("A judicial comment . . . unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive).").

Even assuming that the above language is not dicta, the opinion as a whole shows *Wilkes County* only discussed vested rights in the context of real and personal property. In considering whether the legislation at issue implicated a vested right, for instance, this Court stated that "the [l]egislature cannot divest a vested right to a defense under the statute of limitations, *whether the case involves the title to real estate or personal property*." *Wilkes County*, 204 N.C. at 169, 167 S.E. at 694 (emphasis added). Thus, the statute affected a vested right because it affected title to property, not because it amended a statute of limitations. Given the rest of *Wilkes County*'s narrow focus on property rights, there is no reason to extend this part of the opinion to the tort-based question before us today. *See Nantahala Power & Light Co. v. Moss*, 220 N.C. 200, 208, 17 S.E.2d 10, 16 (1941) ("The law discussed in any opinion is set within the framework of the facts of that particular case. . . . 'Not infrequently the statements . . . [seem to] universaliz[e] some principle when in truth they are intended to express something peculiar to the case.' " (quoting Jesse Franklin Brumbaugh, *Legal Reasoning and Briefing* 195 (1917))). Defendant's reliance is misplaced.

Defendant also directs us to *Jewell v. Price*, 264 N.C. 459, 142 S.E.2d 1 (1965), a decision it argues applied *Wilkes County* to tort actions. The plaintiffs in that case sued a contractor for negligently installing their furnace over three years prior to bringing suit. *Id.* at 459–60, 142 S.E.2d at 2. At the time the plaintiffs sued, the relevant statute of limitations was three years. *Id.* at 460, 142 S.E.2d at 3. As in *Wilkes County*, however, the plaintiffs in *Jewell* claimed that they could rely on a new law, enacted *after* they brought suit, extending the statute of limitations from three years to six. *Id.* at 460–62, 142 S.E.2d at 2–4.

This Court ultimately ruled for the defendant. *Id.* at 463, 142 S.E.2d at 5. It reasoned that the plaintiffs could not avail themselves of a statute that did not exist when they first brought their claim, mirroring the holding of *Wilkes County*. *Id.* at 462–63, 142 S.E.2d at 4–5. Indeed, the plain language of the statute at issue in *Jewell*—just like the law in *Wilkes County*—shows that it was not meant to apply retroactively. *See* Act of June 19, 1963, ch. 1030, § 3, 1963 N.C. Sess. Laws 1300, 1301 ("This Act shall be in full force and effect from and after its ratification.").

Defendant's argument about *Jewell* depends upon the following quotation: "If this action was already barred when it was brought . . . , it may not be revived by an act of the legislature, although that body may extend at will the time for bringing actions not already barred by an existing statute." *Jewell*, 264 N.C. at 461, 142 S.E.2d at 3 (citing *Wilkes County*, 204 N.C. at 169, 167 S.E. at 694). But this portion of *Jewell* is dicta. The words "when it was brought" are key here. When the parties in *Wilkes*

*County* and *Jewell* first sued, the applicable statutes of limitations unambiguously barred their lawsuits. *Id.* at 460, 142 S.E.2d at 3; *Wilkes County*, 204 N.C. at 166, 167 S.E. at 692–93. Both cases turned on whether to apply new laws, enacted *after* the original claims were filed, to circumvent the old statutes of limitations. *Jewell*, 264 N.C. at 460–62, 142 S.E.2d at 2–4; *Wilkes County*, 204 N.C. at 166, 167 S.E. at 692–93. Here, however, the General Assembly revived plaintiffs' claims *before* they sued. Therefore, the action in this case was not "already barred when it was brought."[11]

Additional context from *Jewell* confirms that the decision only used *Wilkes County* in dicta:

> *[The p]laintiffs rightly allow that subsection (5) of [N.C.]G.S. [§] 1-50, enacted in 1963, after the institution of this suit, has no application.* If this action was already barred when it was brought *on January 12, 1962*, it may not be revived by an act of the legislature, although that body may extend at will the time for bringing actions not already barred by an existing statute.

*Jewell*, 264 N.C. at 461, 142 S.E.2d at 3 (emphases added) (citing *Wilkes County*, 204 N.C. at 169, 167 S.E. at 694). This language shows not only that this Court was aware of the statute's purely prospective scope but also that it was not articulating a broad rule derived from *Wilkes County*. Instead, it was merely commenting on the plaintiffs' concession that the old statute of limitations governed their lawsuit. Thus,

---

[11] This fact distinguishes the instant case from not only *Wilkes County* and *Jewell*, but also our contemporaneously issued decision in *Doe 1K v. Roman Catholic Diocese. See Doe 1K*, slip. op. at 3–4. In *Doe 1K*, we held that section 4.2(b) did not revive claims decided before the SAFE Child Act's passage. *Id.* at 6.

defendant's citation to *Jewell* is unpersuasive. *Jewell*'s "rule" is dicta, just like the one presented in *Wilkes County*.

The other cases defendant cites for this proposition fail for similar reasons. Some, like *Wilkes County*, created dicta. *See, e.g.*, *Johnson v. Winslow*, 63 N.C. 552, 553 (1869) (addressing the narrow question of the General Assembly's power to alter nonexpired statutes of limitations but quoting a constitutional treatise's much broader statement that "[h]e who has satisfied a demand, cannot have it revived against him" (citation omitted)); *Whitehurst v. Dey*, 90 N.C. 542, 545 (1884) (analyzing statutes with retroactive procedural effect "within the inhibition of the *[F]ederal [C]onstitution*" (emphasis added)).[12] Others, like *Jewell*, either relied on the aforementioned dicta or built on it with dicta of their own. *See, e.g.*, *Sutton v. Davis*, 205 N.C. 464, 467–69, 171 S.E. 738, 739–40 (1933) (using *Wilkes County* to conclude that the challenged statute, which had no retroactive effect, would be unconstitutional if it *were* retroactive); *Waldrop v. Hodges*, 230 N.C. 370, 373, 53 S.E.2d 263, 265 (1949) (relying on *Johnson*, *Whitehurst*, and *Wilkes County*); *McCrater v. Stone & Webster Eng'g Corp.*, 248 N.C. 707, 710, 104 S.E.2d 858, 860–61 (1958) (citing *Waldrop* but recognizing that it did not apply). But "dicta upon dicta does not the law make," as the lead opinion at the Court of Appeals explained.

---

[12] Moreover, the Supreme Court of the United States rejected *Whitehurst*'s interpretation of the Federal Constitution less than a year later. *See Campbell v. Holt*, 115 U.S. 620, 628, 6 S. Ct. 209, 213 (1885) ("We certainly do not understand that a right to defeat a just debt by the statute of limitations is a vested right, so as to be beyond legislative power in a proper case.").

*McKinney*, 290 N.C. App. at 424–25, 892 S.E.2d at 476 (italics omitted) (citing *Hayes v. Wilmington*, 243 N.C. 525, 539, 91 S.E.2d 673, 684 (1956)).

Defendant therefore fails to show beyond a reasonable doubt that the running of a tort claim's statute of limitations creates a constitutionally protected vested right. *See Harper*, 384 N.C. at 323, 886 S.E.2d at 414; *Cmty. Success*, 384 N.C. at 212, 886 S.E.2d at 32; *Holmes*, 384 N.C. at 435–36, 886 S.E.2d at 129. We take no position on defendant's policy arguments about the general wisdom of retroactive legislation. Those concerns are best addressed to the General Assembly. *See Rhyne v. K-Mart Corp.*, 358 N.C. 160, 169, 594 S.E.2d 1, 8 (2004); *Harper*, 384 N.C. at 321–23, 886 S.E.2d at 413–14 (discussing the purpose of the separation of powers). As we stated in *Community Success*:

> Almost by definition, legislation involves the weighing and accommodation of competing interests, and it is the role of the legislature, rather than this Court, to balance disparate interests and find a workable compromise among them. . . . Put differently, this Court will only measure the balance struck in the statute against the minimum standards required by the constitution.

*Cmty. Success*, 384 N.C. at 212, 886 S.E.2d at 32 (internal citations and quotations omitted).

## D. Substantive Due Process

We close by addressing the portion of the Court of Appeals' lead opinion that applied substantive due process. Despite "[h]aving held that . . . our constitutional text, unique state history, and related jurisprudence" established that laws like

section 4.2(b) were not facially unconstitutional beyond a reasonable doubt, the lead opinion also proceeded to analyze the question using the tiered substantive due process approach. *McKinney*, 290 N.C. App. at 428, 892 S.E.2d at 478. It explained these standards as follows:

> In order to determine whether a law violates substantive due process, we must first determine whether the right infringed upon is a fundamental right. If the right is constitutionally fundamental, then the court must apply a strict scrutiny analysis wherein the party seeking to apply the law must demonstrate that it serves a compelling state interest. If the right infringed upon is not fundamental in the constitutional sense, the party seeking to apply it need only meet the traditional test of establishing that the law is rationally related to a legitimate state interest.

*Id.* at 429–30, 892 S.E.2d at 479 (quoting *State v. Fowler*, 197 N.C. App. 1, 20–21, 676 S.E.2d 523, 540–41 (2009)). The lead opinion then determined that "under even the highest level of scrutiny," section 4.2(b) "passe[d] constitutional muster." *Id.* at 432, 892 S.E.2d at 480.

This alternative line of reasoning was unnecessary. Defendant, as the challenging party, had the burden of proving facial unconstitutionality beyond a reasonable doubt. *Cmty. Success*, 384 N.C. at 212, 886 S.E.2d at 32. Defendant chose to premise its argument on our vested rights doctrine. It believed the ability to rely on an existing statute of limitations was a vested right "immune to infringement by the [l]egislature." Defendant did not contend in the alternative that section 4.2(b) violated principles of substantive due process. In fact, it expressly asked this Court and the Court of Appeals *not* to apply these principles to its argument—recognizing

that "[t]here [was] no good reason . . . to pursue this line of reasoning" and acknowledging that a "balancing test framework" was "particularly inappropriate in the context of North Carolina's vested rights doctrine."

The Court of Appeals correctly concluded that text, context, and precedent did not support defendant's interpretation of the vested rights doctrine. When it did so, it rejected defendant's entire constitutional challenge. Because the tiered substantive due process framework was immaterial to defendant's argument, there was no reason for the court's opinion to apply it.

## IV.   Conclusion

The text of the relevant constitutional provisions, the historical context in which the people of North Carolina adopted them, and our precedents all confirm that there is no constitutionally protected vested right in the running of a tort claim's statute of limitations. The decision of the Court of Appeals is modified and affirmed.

MODIFIED AND AFFIRMED.

Justice RIGGS did not participate in the consideration or decision of this case.

Justice EARLS concurring in the result only.

I agree with the majority's outcome affirming the Court of Appeals' judgment upholding the revival provision of the SAFE Child Act. I write separately to underscore where there is consensus among members of the Court and to explain my disagreements with the majority's reasoning.

First and foremost, where we agree: All justices would hold that the political branches may enact remedial legislation that empowers survivors of child sexual abuse to recover for the harm they endured at the hands of their abusers and those that enabled the abuse, through civil litigation of claims that would have otherwise been barred by the statute of limitations. *See also Cohane v. Home Missioners of Am.*, No. 278A23 (N.C. Jan. 31, 2025). We agree that our previous cases do not create a substantive entitlement to a statute of limitations, nor does the Law of the Land Clause impair the legislature's ability to alter remedial provisions for the defense of one's rights. *See* majority *supra* Section III.A. Today's judgment enables Dustin Michael McKinney, George Jermey McKinney, and James Robert Tate, as well as other plaintiffs who brought revival claims under the SAFE Child Act, to have their day in court, pursuant to a lawful act of the legislature.

Despite this broad consensus, the majority uses this case to expound "the methodology by which we evaluate a constitutional challenge." *See* majority *supra* Section II.B. The majority explains that its interpretive method is *not* to "isolate the

[constitutional] provision's meaning at the time of its ratification," as previously thought, *see Cmty. Success Initiative v. Moore*, 384 N.C. 194, 213 (2023), but rather to trace a constitutional provision back in time to its earliest appearance in our constitutions and key its meaning to that time, *see* majority *supra* note 5. Under the majority's approach, precedent is inversely important: older cases have more force as to the meaning of our Constitution than newer ones. Same with the constitutions themselves—the context surrounding ratification of North Carolina's 1971 Constitution "lacks much persuasive value" relative to the 1868 and 1776 constitutions. *Id.*

I disagree strongly with this approach. Not only is it odd as a mode of judicial decision-making in a democracy, since it freezes the meaning of our Constitution in amber according to narrow circumstances in centuries past; but it is also in tension with rule of law principles, by giving greater weight to old caselaw over new, contrary to what is taught in law schools and to what common sense compels.

It is important to understand that this approach is a form of extreme originalism that threatens to bring the law and constitutional protections back to that point in this state's history when slavery was legal and women could not own property or vote.[1] Even Justice Scalia warned that extreme originalism would be "so disruptive

---

[1] This critique of extreme originalism is not new in caselaw or legal academic literature. For example, in *Michael H. v. Gerald D.*, 491 U.S. 110 (1989), Justice Brennan wrote of the plurality's interpretation of the Fourteenth Amendment in that case:
> The document that the plurality construes today is unfamiliar to me. It is not the living charter that I have taken to

of the established state of things" that it "w[ould] be useful only as an academic exercise." Antonin Scalia, *A Matter of Interpretation* 139 (Amy Gutmann ed., 1997). It is not how this Court has previously approached interpreting the North Carolina Constitution, despite the majority's attempt to make it so by saying it over and over again since 1 January 2023.[2]

Original intent can certainly be an important consideration, but where the majority goes awry is in cherry-picking facts as a veneer to justify their subjective value judgments. One fact is unassailable: our federal and state constitutions, from their inceptions, were intended to be forward looking towards the promise of a more perfect union, not backward. Our experiment in democracy can be and should be perfected over time towards realizing the Founder's core promises of liberty and equal protection under the law. Attempting to cloak a retreat from these core promises in the pseudo-intellectualism of originalism is, in reality, cynically antithetical to our Founder's intent.[3]

---

be our Constitution; it is instead a stagnant, archaic, hidebound document steeped in the prejudices and superstitions of a time long past. *This* Constitution does not recognize that times change, does not see that sometimes a practice or rule outlives its foundations. I cannot accept an interpretive method that does such violence to the charter that I am bound by oath to uphold.

*Id.* at 141 (Brennan, J., dissenting).

[2] All of the cases cited by the majority that purportedly endorse extreme originalism were decided after this date.

[3] For example, Thomas Jefferson acknowledged that "laws and institutions must go hand in hand with the progress of the human mind," otherwise "[w]e might as well require a man to wear still the coat which fitted him when a boy, as civilized society to remain ever under the regimen of their barbarous ancestors." Letter from Thomas Jefferson to Henry Tompkinson (Samuel Kercheval) on July 12, 1816,

This Court has always employed a range of tools that help us interpret our Constitution. Namely we look to constitutional text and structure; historical context, as well as the context of our state as one in a federal system; and importantly for a court of law, precedent. *E.g.*, *State v. Kelliher*, 381 N.C. 558, 578–84 (2022); *State ex rel. McCrory v. Berger*, 368 N.C. 633, 639 (2016); *Stephenson v. Bartlett*, 355 N.C. 354, 378 (2002); *Leandro v. State*, 346 N.C. 336, 352 (1997).[4] We seek harmony among

---

https://founders.archives.gov/documents/Jefferson/03-10-02-0128-0002 (last visited Jan. 27, 2025). That thinking was reflected by framers ahead of the Convention of 1787. One such framer observed the necessity of employing "essential principles only; lest the operations of government should be clogged by rendering those provisions permanent and unalterable, which ought to be accommodated to times and events," and espoused that the constitution should be comprised of "general propositions, according to the example of the (several) constitutions of the several states." Edmund Randolph, *Draft Sketch of a Constitution* (July 26, 1787), *in Supplement to Max Farrand's The Records of the Federal Convention of 1787*, at 183 (James H. Hutson ed., 1987). After all, "the construction of a constitution necessarily differs from that of law." *Id.*

Scholars have debunked the notion that constitutional framers expected anything like extreme originalism. *See, e.g.*, H. Jefferson Powell, *The Original Understanding of Original Intent*, 98 Harv. L. Rev. 885, 903–04 (1985) ("The framers shared the traditional common law view . . . that the import of the document they were framing would be determined by reference to the intrinsic meaning of its words or through the usual judicial process of case-by-case interpretation." (cleaned up)). "Nearly two years after the Constitution was written, for example, Georgia representative James Jackson took to the floor of the First Congress to draw attention to the amorphous nature of the country's founding document: 'Our constitution,' he said, 'is like a vessel just launched, and lying at the wharf, she is untried, you can hardly discover any one of her properties.' " Erwin Chemerinksy, *Worse Than Nothing* 83 (2022) (cleaned up).

On the political expedience of extreme originalism, see generally Robert Post & Reva Siegel, *Originalism as a Political Practice: The Right's Living Constitution*, 75 Fordham L. Rev. 545 (2006).

[4] State and federal constitutional law have long been subject to dynamic interplay. State constitutional framers took notes from peer state constitutions, and federal framers from states. *E.g.*, Scott Douglas Gerber, *A Distinct Judicial Power: The Origins of an Independent Judiciary, 1606–1787*, at 201–02 (2011) (noting John Adams's influence in the formulation of the 1776 North Carolina Constitution and the inspiration for North Carolina's Declaration of Rights from Virginia, Maryland, and Pennsylvania); Akhil Reed Amar, *America's Constitution: A Biography* 5–53 (2007) (tracking the interplay between state and

varying provisions of law, keeping in mind that "it is *a constitution* we are expounding." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407 (1819). We are bound by our precedent, or else must give principled reasons for departing from it—reasons that contribute to an overall sense of fairness and coherence necessary to the rule of law. Ultimately, I do not believe that the majority will succeed in its agenda to elevate its confused, extreme, and hypocritical method of constitutional interpretation over the range of interpretive tools long recognized by our Court.

Applying the conventional range of tools here, I would hold that the Constitution does not forbid the General Assembly from restoring a remedy lost by lapse of time. Statutes of limitations are "clearly procedural" devices rather than "substantive definition[s] of rights." *Boudreau v. Baughman*, 322 N.C. 331, 340–41 (1988). The shelter of a limitations defense is procedural, too, and "affect[s] only the remedy directly and not the right to recover." *Id.* at 340. For that reason, there is no absolute entitlement to invoke the statutory time bar. As well, labeling an interest a "vested right" does not remove it from the normal channels of constitutional review. Consistent with its policymaking authority, the legislature may retroactively amend

---

federal actors in the development of the preamble of the Constitution and efforts to commit to form a more perfect union). This interplay continues through modern interpretation. *E.g.*, Goodwin Liu, *State Courts and Constitutional Structure*, 128 Yale L.J. 1304, 1311 (2019) (reviewing Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* (2018)) (arguing that often "state and federal courts are jointly engaged in interpreting shared texts or shared principles within a common historical tradition or common framework of constitutional reasoning" and challenging the perception that "state courts are less protective of individual rights than federal courts").

procedural rules if it does so in a reasonable way and for a legitimate purpose.

Section 4.2(b) meets that standard. North Carolina's political branches have a legitimate and indeed laudable interest in giving victims a chance to seek justice, a goal which finds express voice in our Constitution. *See* N.C. Const. art. I, § 18 ("All courts shall be open; every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law; and right and justice shall be administered without favor, denial, or delay."). Legislators passed the SAFE Child Act with such remedial concerns in mind. They explained that child sexual abuse is a "silent epidemic" shrouded in misunderstanding and that this change in public policy was designed to track "the brain science" showing that many survivors of such abuse have "the ability to finally come forward only as an adult—as a seasoned adult." *See* H. Deb. on S.L. 2019-245, at 18:45, 33:03 (N.C. June 19, 2019) (statement of Rep. Dennis Riddell), https://ncleg.gov/Documents/9/1548. The SAFE Child Act is a measured response to what the General Assembly deemed to be a pressing public crisis and thus does not unduly infringe on the constitutional rights of defendants to SAFE Child Act actions. Accordingly, I concur in the majority's result only.

## I. Background and Analysis

### A. The Plaintiffs

During the mid-1990s and early 2000s, plaintiffs Dustin Michael McKinney, George Jermey McKinney, and James Robert Tate were students at East Gaston High School. They were also members of the school's wrestling team. All were coached

by Gary Scott Goins. And all were targeted by Goins before joining the wrestling team—Dustin at age eleven, George at fourteen, and James at thirteen. Plaintiffs testified at Goins's criminal trial, recounting how he groomed them and used his position of trust and authority to inflict abuse. *See State v. Goins*, 244 N.C. App. 499, 501, 508–09 (2015).

The allegations paint a disturbing picture. Goins assaulted plaintiffs many times in many places—including classrooms, cars, and athletic offices on school property. He showed his victims pornography to desensitize them to sex. On trips to wrestling tournaments, Goins kept plaintiffs' parents at arm's length to ensure private access to the boys. The trauma, plaintiffs say, has lasted—they report experiencing depression, anxiety, post-traumatic stress disorder, and other symptoms.

In 2014, Goins was convicted on charges linked to his abuse of East Gaston wrestlers and sentenced to 34.5 years in prison. According to plaintiffs, that is only partial justice. They place some responsibility on the Gaston County Board of Education, which employed Goins from 1993 until his arrest in 2013. During those two decades, plaintiffs allege, the Board received many complaints about Goins's conduct. Yet the Board did little, choosing cursory investigation over real action. The lack of oversight, plaintiffs argue, emboldened Goins and enabled his continued abuse.

Under past law, plaintiffs' claims would be time-barred. Since plaintiffs were

minors during Goins's abuse, the three-year statute of limitations tolled until they turned eighteen. *See* N.C.G.S. § 1-17(a)(1) (2023). Dustin's claims thus expired in 2007, George's in 2003, and James's around 2008.

## B. The SAFE Child Act

In 2019, however, the SAFE Child Act gave plaintiffs a second chance. That law, unanimously adopted by the General Assembly, aimed to protect children from sexual abuse by strengthening and modernizing the laws surrounding it. Indeed, that purpose was inscribed in the law's title. *See* An Act to Protect Children from Sexual Abuse and to Strengthen and Modernize Sexual Assault Laws (SAFE Child Act), S.L. 2019-245, 2019 N.C. Sess. Laws 1231. Among other changes, the Act amended the time limits for child sexual abuse claims. *See id.* §§ 4.1–4.2(a), 2019 N.C. Sess. Laws at 1234–35. It modified the statutes of limitations for minors' tort suits, extending the time for victims of abuse to sue after they become adults. *See id.* § 4.1, 2019 N.C. Sess. Laws at 1234 (codified at N.C.G.S. § 1-17(d)–(e) (2023)).

The General Assembly also revisited the time bar for claims covered by N.C.G.S. § 1-52. In general terms, that provision gives plaintiffs three years to sue after their cause of action accrues. *See, e.g.*, N.C.G.S. § 1-52(5), (16), (19) (2023). The SAFE Child Act modified three subsections to exempt child sexual abuse actions from that three-year limit. SAFE Child Act § 4.2(a), 2019 N.C. Sess. Laws at 1234–35. Most important to this case, section 4.2(b) of the Act revived certain civil claims barred by the old limitations window:

> Effective from January 1, 2020, until December 31, 2021, this section revives any civil action for child sexual abuse otherwise time-barred under G.S. 1-52 as it existed immediately before the enactment of this act.

*Id.* § 4.2(b), 2019 N.C. Sess. Laws at 1235.

## C. Proceedings Below

Relying on section 4.2(b) of the Act, plaintiffs sued Goins[5] and the Board on 2 November 2020 in Superior Court, Gaston County. Against the Board, in particular, plaintiffs brought claims for assault and battery; negligent hiring, retention, and supervision; negligent infliction of emotional distress; intentional infliction of emotional distress; constructive fraud; false imprisonment; and punitive damages. The Board answered and counterclaimed. It argued that plaintiffs' claims remained time-barred because section 4.2(b) "is facially unconstitutional." On the same ground, the Board later moved to dismiss plaintiffs' suit under Rule 12(b)(6). It also successfully sought to transfer its facial challenge to a three-judge panel, and the State intervened to defend section 4.2(b)'s constitutionality.

The three-judge panel heard the Board's motion to dismiss on 21 October 2021. In a divided decision, the majority held that section 4.2(b) facially violated the Law of the Land Clause by retroactively reviving time-barred claims. Citing this Court's decision in *Wilkes County v. Forester*, 204 N.C. 163 (1933), the majority reasoned that once a limitations period runs, a defendant secures a "vested right" to a limitations

---

[5] Because Goins is serving his prison sentence, he has never appeared in this case, and plaintiffs voluntarily dismissed their claims against him without prejudice.

defense that the legislature cannot rescind. It thus granted the Board's motion and ordered plaintiffs' suit dismissed. Plaintiffs and the State appealed.

In a divided decision, the Court of Appeals reversed the order and held that section 4.2(b) was facially constitutional. *McKinney v. Goins*, 290 N.C. App. 403, 411 (2023). Drawing on constitutional text, history, and precedent, the majority traced the evolution of the vested rights doctrine and its intersection with the Law of the Land Clause. *See id.* at 413–20. Those sources showed that "no claim to or interest in property invariably stems from a defendant's reliance on the procedural bar provided by the statute of limitations, and thus no vested right is impacted when that bar is lifted." *Id.* at 416. For that reason, the court held that the "revival of a statute of limitations does not *per se* violate the North Carolina Constitution." *Id.* at 417. Nor did *Wilkes County* impose a categorical barrier to statutes like section 4.2(b). *Id.* at 423. Instead, that decision prescribed a property-based rule for "revival statutes where the expired claim was explicitly for *title* to property." *Id.* Properly read, the court concluded, *Wilkes County* did not foreswear the legislature from reviving time-barred civil *tort* claims. *Id.* at 424–28.

The Court of Appeals then examined section 4.2(b)'s substantive reasonableness under the tiered due process framework. *See id.* at 428–30. The statute did not implicate a fundamental right, the court explained, and so rational basis was the proper standard. *Id.* at 430. But section 4.2(b) passed even strict scrutiny. *See id.* It advanced a compelling state interest: vindicating "the rights of

child victims of sexual abuse—and ensuring abusers and their enablers are justly held to account to their victims for the trauma inflicted." *Id.* And the law was narrowly drawn to achieve those goals—it resuscitated a limited class of time-barred claims for a two-year window without changing the substantive law or burden of proof. *Id.* at 430–31. Because section 4.2(b) passed any level of judicial scrutiny, the Court of Appeals rejected the Board's facial challenge and reversed the three-judge panel's order.

The dissenting judge would have held that "*Wilkes County* and its progeny control this case." *Id.* at 432 (Carpenter, J., dissenting). True, the dissent conceded, the "prohibition of reviving time-barred claims is not a textual one; the text of the North Carolina Constitution lacks such a provision." *Id.* But *Wilkes County* nonetheless doomed section 4.2(b), the dissent concluded, as it "established a broad vested right against revival legislation." *Id.* at 436. Though suggesting that "perhaps *Wilkes* [*County*] should be overruled" given "its lack of support from the text of our state Constitution," the dissent deemed the decision controlling and fatal to section 4.2(b). *Id.* at 442.

The Board appealed to this Court based on the dissent below. *See* N.C.G.S. § 7A-30(2) (2023).

**D. Legal Framework**

The Board argues that, on its face, section 4.2(b) violates the Law of the Land Clause by retroactively reviving plaintiffs' time-barred claims. I therefore begin by

reviewing the legal standards for facial constitutional challenges to a statute. My analysis then turns to the constitutional limits on retroactive laws.

### 1. Facial Constitutional Challenges

A facial challenge assails a statute "as a whole, rather than as to particular applications." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2393 (2023). To succeed, the challenger must show "that no set of circumstances exists under which the law would be valid" or that the statute "lacks a plainly legitimate sweep." *Id.* at 2397 (cleaned up); *accord Hart v. State*, 368 N.C. 122, 139 n.12 (2015). Said differently, the question is whether the law is "incapable of any valid application." *Steffel v. Thompson*, 415 U.S. 452, 474 (1974).

This standard aligns with our default "presumption that the laws duly enacted by the General Assembly are valid." *Fearrington v. City of Greenville*, 386 N.C. 38, 54 (2024) (quoting *Hart*, 368 N.C. at 126). This Court does "not lightly assum[e]" that the legislature has discarded the people's will. *State ex rel. Martin v. Preston*, 325 N.C. 438, 448 (1989). After all, "[a]ll power which is not expressly limited by the people in our State Constitution remains with the people, and an act of the people through their representatives in the legislature is valid unless prohibited by that Constitution." *Id.* at 448–49. Yet "[i]t is the state judiciary that has the responsibility to protect the state constitutional rights of the citizens," including the "security of the citizens in regard to both person and property." *Corum v. Univ. of N.C.*, 330 N.C. 761, 783 (1992). Thus, while this Court has the "authority and responsibility to declare a

law unconstitutional," that power is reserved only for "when the violation is plain and clear." *Hart*, 368 N.C. at 126. I note that this authority lies at the heart of what it means to have a constitution. Without some power to enforce constitutional guarantees, they are nothing more than aspirational value statements.[6]

To determine whether the alleged constitutional violation is plain and clear, we look to the constitutional text, context, and our precedents. *Berger*, 368 N.C. at 639. We seek harmony among different constitutional provisions and the constitutional structure, with an eye toward interpreting the document as a whole. *See Stephenson*, 355 N.C. at 378 ("[A]ll constitutional provisions must be read *in pari materia.*"); *Leandro*, 346 N.C. at 352 (noting that "a constitution cannot violate itself," so different provisions must be read in harmony).

The presumption of constitutionality is particularly important for facial claims

---

[6] Historical accounts confirm North Carolina's long tradition of judicial independence and the exercise of judicial review to protect and enforce individual rights. Framers and influencers of the 1776 Constitution insisted on a written separation of powers clause and other tenure and salary protections for judges, reacting in part to capricious and heavy-handed royal proprietors of the early colony. *A Distinct Judicial Power*, at 199–204. Their insistence helped North Carolina constitutionalize the principle of judicial independence earlier than nearly every other state. *Id.* at 204. Other early leaders fought against legislative interference that threatened the judiciary's distinct role, recognizing that judicial independence was essential to "any constitutional order committed to protecting individual rights." *Id.* at 205–06.

Judicial independence and judicial review, of course, go together—without independence from the legislature or executive, judges who exercise judicial review to invalidate legislation that impairs constitutional rights are at risk of removal or salary reductions. *Id.* at 333–34. Especially in constitutions that contain only certain limits on legislative authority, courts must preserve such limitations. Otherwise, "all the reservations of particular rights or privileges would amount to nothing. *Id.* at 342–43 (quoting *The Federalist No. 78*, at 466 (Alexander Hamilton) (Clint Rossiter ed., 1961)).

alleging that a law "*always* operates unconstitutionally," *Facial Challenge*, Black's Law Dictionary (12th ed. 2024) (emphasis added), given that policy "arguments are more properly directed to the legislature," *State v. Anthony*, 351 N.C. 611, 618 (2000); *see also Rhyne v. K-Mart Corp.*, 358 N.C. 160, 169–70 (2004) (explaining the legislature's superior institutional capacity to address policy concerns). I review the Board's facial challenge within the framework of this presumption of constitutionality.

### 2. *Constitutional Limits on Retroactive Laws*

According to the Board, section 4.2(b) violates the constitutional restraints on retroactive legislation by resuscitating claims after the statute of limitations has elapsed. But that argument is not supported by the text and context of our Constitution, which takes a permissive view toward civil retroactivity.

A law is retroactive if it "alter[s] the legal consequences of conduct or transactions completed prior to its enactment." *Gardner v. Gardner*, 300 N.C. 715, 718 (1980). The constitutional text places only two explicit limits on retroactivity—both in Article I, Section 16. Within that provision, the Ex Post Facto Clause first forbids laws that "punish[ ] acts committed before [their existence] and by them only declared criminal." N.C. Const. art. I, § 16. That safeguard, however, only "applies to matters of a criminal nature." *State v. Bell*, 61 N.C. (Phil.) 76, 81 (1867). Second, Section 16 mentions just one type of civil law: those taxing "sales, purchases, or other acts previously done." N.C. Const. art. I, § 16.

Beyond those express restraints, Section 16 is otherwise silent on civil retroactivity. That silence is significant because of the canon of *expressio unius est exclusio alterius*: where a list contains two or more "situations to which it applies, it implies the exclusion of situations not contained in the list." *Cooper v. Berger*, 371 N.C. 799, 810 (2018) (quoting *Evans v. Diaz*, 333 N.C. 774, 779–80 (1993)). Applying that canon here, that the Constitution specifically limits two types of retroactive legislation, including one specific type of civil retroactive legislation on taxes, suggests that other types of retroactive civil legislation, like changes to civil remedial provisions, are permitted.

Application of this canon to our Constitution depends on context, *see id.* at 810–11, and historical context here confirms this interpretation. As the Court of Appeals below noted, as early as 1794, North Carolina courts recognized that the legislature could pass a law authorizing the attorney general to obtain judgments retroactively against receivers of public money. *See McKinney*, 290 N.C. App. at 414 (citing *State v. Anonymous*, 2 N.C. (1 Hayw.) 28, 28–29, 39–40 (1794)); *Anonymous*, 2 N.C. (1 Hayw.) at 39 (upholding a law authorizing the attorney general to take judgment against the receivers of public moneys, by motion, after hearing argument by the attorney general that no "part of our Constitution prohibit[s] the passing of a retrospective law"). That understanding was later affirmed by *Bell*, 61 N.C. (Phil.) 76, where the Court upheld a retroactive tax against a constitutional challenge, *id.* at 86, applying the *expressio unius* maxim and concluding, "The omission of any such

prohibition in the Constitution of the . . . State, is a strong argument to show that retrospective laws, merely as such, were not intended to be forbidden," *id.* at 83. That permissive approach has been reaffirmed in numerous precedents since. *See Tabor v. Ward*, 83 N.C. 291, 294 (1880) ("Retroactive laws are not only not forbidden by the state constitution but they have been sustained by numerous decisions in our own state.").

Notable too is that the year after *Bell*, North Carolina ratified a new Constitution—this time adding a new limitation that prohibited any "law taxing retrospectively, sales, purchases, or other acts previously done." N.C. Const. of 1868, art. I, § 32. Even as other state constitutions at this time prohibited retrospective laws for civil cases, of any kind or category,[7] North Carolinians chose to enact a narrower limitation on retrospective legislation, targeting only retroactive taxes. This historical context further confirms that the Constitution contemplates the General Assembly's ability to revive time-lapsed civil tort claims.

### 3. *Law of the Land Clause Challenge*

---

[7] *E.g.*, N.H. Const. pt. 1, art. 23 (adopted 1792) ("Retrospective laws are highly injurious, oppressive and unjust. No such laws, therefore, should be made, either for the decision of civil causes, or the punishment of offences."); Tenn. Const. of 1834, art. I, § 20 ("[N]o retrospective law, or law impairing the obligation of contracts, shall be made."); Tex. Const. of 1866, art. I, § 14 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts shall be made . . . ."). Some state constitutions even explicitly bar retroactive remedies. *E.g.*, Okla. Const. art. V, § 52 (adopted 1907) ("The Legislature shall have no power to revive any right or remedy which may have become barred by lapse of time, or by any statute of this State.").

Recognizing that there is no express limitation on civil, retroactive legislation under Article I, Section 16, the Board points to Article I, Section 19, which bars the state from depriving citizens of "life, liberty, or property, but by the law of the land." N.C. Const. art. I, § 19. This provision, aptly called the Law of the Land Clause, "secure[s] the individual from the arbitrary exercise of the powers of government." *See Halikierra Cmty. Servs. LLC v. N.C. Dep't of Health & Hum. Servs.*, 385 N.C. 660, 663 (2024) (quoting *Gunter v. Sanford*, 186 N.C. 452, 456 (1923)). In practical terms, the Clause "guards against unreasonable government actions that deprive people of life, liberty, or property." *Askew v. City of Kinston*, 386 N.C. 286, 294 (2024).

The Board argues that the Law of the Land Clause places additional restrictions on the legislature's ability to act retroactively, and specifically, it claims a "vested right" protected by that Clause in a statute-of-limitations defense. Once the three-year window closed for plaintiffs to bring their claims, the Board contends, it acquired a vested right to raise the statutory time bar that is immune from retroactive changes. It further cites *Wilkes County* for the proposition that it has a "vested right" in an elapsed statute of limitations that would facially invalidate the revival provision at issue here. But the Board's argument fails at the threshold, because the right to invoke an elapsed statute of limitations in a civil tort claim is not a vested right under our precedent, notwithstanding *Wilkes County*. I would apply the substantive due process analysis to resolve the merits of the Board's claim and hold that the SAFE Child Act withstands such scrutiny.

### a. The Vested Rights Doctrine

The interests protected by the Law of the Land Clause, this Court has explained, include "vested rights." *See, e.g., Charlotte Consol. Constr. Co. v. Brockenbrough*, 187 N.C. 65, 74–76 (1924); *Armstrong v. Armstrong*, 322 N.C. 396, 402 (1988). A vested right is a fixed entitlement "to the present or future enjoyment of property." *Armstrong*, 322 N.C. at 402 (cleaned up). Once a right vests, it is "secured and protected by the law." *Charlotte Consol.*, 187 N.C. at 74 (cleaned up). A statute "which divests or destroys such rights, unless it be by due process of law, is unconstitutional and void." *Id.* (cleaned up).

Yet not all real and personal property rights are vested rights. We have reserved the latter appellation for those interests with the "inherent qualities that are necessary to give [them] the body and significance of a constitutionally protected property right." *Pinkham v. Unborn Child. of Jather Pinkham*, 227 N.C. 72, 78 (1946). Our vested rights cases have therefore centered on core forms of property like land, deeds, and inheritance. *See, e.g., Univ. of N.C. v. Foy*, 5 N.C. (1 Mur.) 58 (1805) (land); *McDonald's Corp. v. Dwyer*, 338 N.C. 445 (1994) (land); *Lowe v. Harris*, 112 N.C. 472 (1893) (land sale contract); *Godfrey v. Zoning Bd. of Adjustment*, 317 N.C. 51 (1986) (nonconforming land use); *Robinson v. Barfield*, 6 N.C. (2 Mur.) 391 (1818) (deeds); *Booth v. Hairston*, 193 N.C. 278 (1927) (deeds); *Scales v. Fewell*, 10 N.C. (3 Hawks) 18 (1824) (liens on real property); *Pratt v. Kitterell*, 15 N.C. (4 Dev.) 168 (1833) (estate administration); *Battle v. Speight*, 31 N.C. (9 Ired.) 288 (1848) (devises of property by

will); *Peele v. Finch*, 284 N.C. 375 (1973) (inheritance).

Moreover, a vested right is one that has vested. It must have matured into an "immediate fixed right of present or future enjoyment." *Pendleton v. Williams*, 175 N.C. 248, 253 (1918). Thus no vested right exists in "a mere expectancy of future benefit, or a contingent interest in property founded on anticipated continuance of existing laws." *Stanback v. Citizens Nat'l Bank of Raleigh*, 197 N.C. 292, 296 (1929) (cleaned up)*; see also Pinkham*, 227 N.C. at 78 ("[N]o person has a vested right in a continuance of the common or statute law."). Relatedly, no vested right exists in "any particular mode of procedure for the enforcement or defense of [one's] rights." *Martin v. Vanlaningham*, 189 N.C. 656, 658 (1925) (cleaned up).

That property–procedure distinction recognizes that procedural rules operate on legal remedies rather than substantive rights. *See Tabor*, 83 N.C. at 294–95. Because there is no "vested right in any particular remedy," we have explained, "retroactive legislation is competent to affect remedies." *Id.* (cleaned up); *see also Strickland v. Draughan*, 91 N.C. 103, 104 (1884) (calling it "well settled that the legislature may change the remedy").

These contours of the vested rights doctrine rest on interlocking principles. For one, the legislature has the power to craft procedural rules and to "define the circumstances" in which a remedy is "legally cognizable and those under which it is not." *Rhyne*, 358 N.C at 170 (quoting *Lamb v. Wedgewood S. Corp.*, 308 N.C. 419, 444 (1983)). By distinguishing property rights from procedural benefits furnished by past

law, this Court has kept the vested rights doctrine from spilling into the legislature's domain. Cognizant that freezing procedure and remedies in place would stagnate the law "in the face of changing societal conditions," *Lamb*, 308 N.C. at 441 (cleaned up), this Court has allowed the legislature to retroactively modify remedies and amend procedural rules—including statutes of limitations, *see, e.g.*, *Strickland*, 91 N.C. at 104 ("It is well settled that the legislature may change the remedy, and as the statute of limitations applies only to the remedy, that it may also change that, either by extending or shortening the time."). *But see Doe 1K v. Roman Cath. Diocese*, Nos. 167PA22 & 168PA22 (N.C. Jan. 31, 2025) (recognizing that separation of powers principles place independent limits on the legislature's ability to act retroactively and reopen final judgments).

### b. *The Procedural Benefit of a Limitations Defense*

Statutes of limitations play a familiar and important role in our legal system. They encourage timely litigation, promote finality, and spare the courts from stale claims. *See Morris v. Rodeberg*, 385 N.C. 405, 409 (2023). As policy tools, they reflect a legislative balancing act, marking "the point at which the right of a party to pursue a claim must yield to competing interests." *Id.* This Court has repeatedly, and recently, explained that statutes of limitations are "clearly procedural" rules rather than substantive sources of rights. *Taylor v. Bank of Am., N.A.*, 385 N.C. 783, 788 n.4 (2024) (cleaned up). They do not define "whether an injury has occurred," but they instead define when "a party can obtain a remedy for that injury." *Christie v. Hartley*

*Constr., Inc.,* 367 N.C. 534, 538 (2014).

Because limitations periods are procedural mechanisms, their lapse does not generally create substantive entitlements. *See id.*; *see also Boudreau*, 322 N.C. at 340. The statutory time bar "affect[s] only the remedy directly and not the right to recover." *Boudreau*, 322 N.C. at 340. It "merely makes a claim unenforceable," *id.,* creating "a bar when set up to the action of the court" without altering "the rights of the parties" or their underlying liability, *Alpha Mills v. Watertown Steam Engine Co.*, 116 N.C. 797, 804 (1895). *See also id.* ("The statute of limitations is no satisfaction of plaintiff's demand."); *Serv. Fire Ins. Co. v. Horton Motor Lines, Inc.*, 225 N.C. 588, 591 (1945) ("[T]he lapse of time does not discharge the liability. It merely bars recovery."); *Williams v. Thompson*, 227 N.C. 166, 168 (1947) (same). To appreciate this point, consider that the practical consequence of an elapsed statute of limitations for a civil claim is only that the defendant gains an affirmative defense—a court may still issue a judgment, and a plaintiff may still recover, if a defendant could have raised it but did not. *See generally Overton v. Overton*, 259 N.C. 31, 36 (1963); N.C.G.S. § 1A-1, Rule 8(c) (2023).

The exception to the general rule that statutes of limitations are merely procedural is when the expiration of the limitations period itself conveys title to real or personal property. *See Vanderbilt v. Atl. Coast Line R.R. Co.*, 188 N.C. 568, 579–80 (1924); *Booth*, 193 N.C. at 286. Adverse possession is the classic example. A person who continuously occupies land for a statutory period—seven years under color of

title or twenty years without—gains legal title to that property. When the statutory window closes, that person acquires ownership of the land, securing a legal right with "the force and effect of an actual title in fee." *Covington v. Stewart*, 77 N.C. 148, 151 (1877). In that case, the lapse of time confers a substantive entitlement that amounts to a property interest, on which the new owner may rely by making improvements to the land or enjoying other free uses consistent with traditional property rights. *Cf.* 1 William Blackstone, *Commentaries* \*138 ("The third absolute right, inherent in every Englishman, is that of property: which consists in the free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the laws of the land."). Beyond that narrow context, however, a statutory time bar is simply a procedural limit "on the remedy used to enforce rights." *Boudreau*, 322 N.C. at 340. It presents no similar reliance concern, since the parties' underlying rights and liabilities are not extinguished by such procedural limits—that is, unlike receiving entitlement to the bundle of sticks comprising real property rights, a party subject to the statutory time bar never gains the right to commit the underlying tort. *See id.*

We made this general rule and its exception clear in *Hinton v. Hinton*, 61 N.C. (Phil.) 410 (1868). There, this Court upheld a statute that revived widows' time-barred dower claims—or a widow's right to a life estate in her deceased husband's property. *See id.* at 413–14; *Yount v. Yount*, 258 N.C. 236, 241 (1962) (noting that dower is "[t]he portion of or interest in the real estate of a deceased husband that is

given by law to his widow during her life"). We emphasized the legislature's "settled" power "to pass retroactive statutes affecting remedies." *Hinton*, 61 N.C. at 415. Because statutes of limitations are procedural, we explained, reopening them "affects the *remedy* and not the right of property." *Id.* Withdrawing a limitations defense "only takes from [a party] the privilege of claiming the benefit of a former statute." *Id.* at 416. The procedural shelter of past law, we concluded, is not a vested property right immune from change. *See id.* at 415–16. The legislature may adjust its scope within the bounds of reason, as *Hinton* and our cases since have explained. *See id.* at 415; *Phillips v. Cameron*, 48 N.C. (3 Jones) 390 (1856); *Morris v. Avery*, 61 N.C. (Phil.) 238 (1867); *Pearsall v. Kenan*, 79 N.C. 472 (1878); *Alpha Mills v. Watertown Steam-Engine Co.*, 116 N.C. 797 (1895); *Graves v. Howard*, 159 N.C. 594 (1912); *Dunn v. Jones*, 195 N.C. 354 (1928); *B-C Remedy Co. v. Unemployment Comp. Comm'n*, 226 N.C. 52 (1946); *Whitted v. Wade*, 247 N.C. 81 (1957); *Overton v. Overton*, 259 N.C. 31 (1963).

Simply put, there is no vested right in "any particular mode of procedure" for the "defense of [one's] rights." *Martin*, 189 N.C. at 658. Absent a transfer of real property, a limitations defense does not, by itself, amount to a vested property right. *See Hinton*, 61 N.C. at 415–16. Applying that long-held rule here, section 4.2(b) does not implicate a vested right because it merely reopens a limitations window for civil tort claims for child sexual abuse. The Board and other prospective defendants do not have a substantive entitlement to a procedural rule entitling them to an affirmative

defense of an elapsed statute of limitations against such claims.

  *c. Distinguishing* Wilkes County

  The Board, however, invites us to depart from this tradition. It leans heavily on *Wilkes County*, claiming that our decision in that case turned a limitations defense into a "vested right" against revived tort claims. *See* 204 N.C. at 170. But the Board misreads *Wilkes County* and overstates its holding.

  First, the constitutional discussion in *Wilkes County* was extraneous to its holding. The case asked whether a county's untimely suit was revived by a law extending the limitations period for select foreclosure actions. *See id.* at 166. We held that the statute, by its terms, did not apply to the county's claim. *Id.* at 168, 170. For that reason, the county's foreclosure action remained time-barred; the statute did not revive it. *Id.* at 168. Our discussion about constitutional limits on the reopening of lapsed claims, on which the Board relies, was thus irrelevant to the outcome because the statute in question did no such thing. Such remarks then, while interesting, do not bind us or freeze the Constitution's meaning in amber.

  The Board points to a smattering of other decisions that cite *Wilkes County*'s constitutional commentary. *See, e.g.*, *Sutton v. Davis*, 205 N.C. 464, 467–69 (1933); *Waldrop v. Hodges*, 230 N.C. 370, 373–74 (1949); *Jewell v. Price*, 264 N.C. 459, 461 (1965). But those cases, like *Wilkes County* itself, did not squarely raise constitutional concerns because the statutes at issue either did not apply to the case or lacked retroactive effect. *See Sutton*, 205 N.C. at 469 (interpreting statutory amendment as

"prospective and not retroactive" and "therefore not applicable to this controversy"); *Waldrop*, 230 N.C. at 374 (noting that statute at issue did not reopen a limitations window because "the time within which the bonds may be marketed has been extended and has not yet expired"); *Jewell*, 264 N.C. at 461 (agreeing with the plaintiffs' concession that a nonretroactive change to the limitations period "enacted in 1963, after the institution of this suit, has no application"). These decisions do not convert *Wilkes County*'s commentary into binding law, because our decisions must be understood and applied "within the framework of the facts of that particular case." *See Howard v. Boyce*, 254 N.C. 255, 265 (1961).

Even taking *Wilkes County*'s commentary at face value, it does not stand for the broad rule the Board suggests. For *Wilkes County* adhered to a long-settled principle: an expired limitations period that transfers title to property is fundamentally different from one that provides only a procedural defense. *See, e.g.*, *Booth*, 193 N.C. at 286. The lapsed limitations period in *Wilkes County* gave defendants title to real property—by failing to foreclose by the statutory deadline, the county surrendered its claim to the lot. *Wilkes County*, 204 N.C. at 167–68. The statutory time bar did more than provide a defense; it conveyed ownership of land. Thus *Wilkes County* fits comfortably in the property-based vested rights tradition and is in harmony with *Hinton*'s distinction between a remedy and right of property. *See* discussion *supra* Section I.D.3.b.

    d.  *Harmonizing* Wilkes County *with the constitutional framework employed by recent cases*

The Board's reading of *Wilkes County* raises a deeper concern. It construes that decision to create two classes of rights: vested rights, which it argues are untouchable, and everything else, which falls under the state's police power. This binary framework would elevate vested rights above fundamental freedoms, like the rights to free speech, to freedom of religion, and from racial discrimination. In my view, our precedent does not prescribe that far-reaching approach.

If *Wilkes County* left any uncertainty about the status of vested rights, this Court has since dispelled it. Vested rights, this Court has made clear, are not a standalone category of constitutional protection. They fall under the "life, liberty, or property" safeguarded by the text of the Law of the Land Clause. *See Charlotte Consol.*, 187 N.C. at 74; *Godfrey*, 317 N.C. at 62 (explaining that the vested rights "doctrine is rooted in the 'due process of law' and the 'law of the land' clauses of the federal and state constitutions"). Vested rights, like other protected interests, are shielded from arbitrary or irrational government action. The state may not impinge on them unless it acts reasonably and in accord with principles of substantive due process. *See Gunter*, 186 N.C. 452. Since *Wilkes County*, this Court has moved away from asking whether a right is vested, focusing instead on whether the statute in question operates reasonably on the interest at stake.

Indeed, this jurisprudential shift began soon after *Wilkes County*. In the 1940s, cases like *Pinkham* questioned the utility of amorphous labels like "vested rights." *See* 227 N.C. 72. When discussing that class of interests, this Court observed, "text

writers and courts are usually forced to define them in terms of themselves, or beg the question." *Id.* at 78 (cleaned up). The same imprecision plagued our own cases. *See id.* This Court noted the lack of a "satisfactory general rule" for identifying what interests count "as 'vested rights' under constitutional protection." *Id.* And we gestured toward a less categorical approach—one that recognized the legislature's authority to amend procedural rules, so long as it acts reasonably and in the public interest. *See id.* at 79–80.

*Gardner* continued this move away from a rigid constitutional framework. *See* 300 N.C. 715. Like *Pinkham*, *Gardner* critiqued the concept of vested rights as "tautolog[ical]" and ill-defined. *Id.* at 719. It also declined to analyze retroactive laws by "play[ing] with conclusory labels." *Id.* at 718. In that case, the legislature amended a statute to allow defendants in divorce actions to relitigate venue, even if a court had entered final judgment on that issue. *Id.* at 716–17. The plaintiff challenged the law, claiming that it retroactively interfered with a vested right. *Id.* at 718–19. We acknowledged that the plaintiff's right to her chosen venue, once adjudicated by a court, was a "substantial" or "vested right." *Id.* at 719. The statute unsettled that right by "attaching a new disability" to the plaintiff—the risk that she would lose her selected venue on the defendant's motion. *Id.* at 718 (cleaned up).

But our constitutional "concern" was not simply "the metaphysics of plaintiff's right to her chosen venue." *Id.* at 719. Instead, we focused "on the constitutional requirement that the judgment which accords that right be stable"—in other words,

on separation of powers concerns. *Id.* The Constitution "vests the judicial power of the State, including the power to render judgments, in the General Court of Justice, not in the General Assembly." *Id.* For that reason, this Court explained, a "legislative declaration may not be given effect to alter or amend a final exercise of the courts' rightful jurisdiction." *Id.* The amended venue provision, however, altered the "legal effect of previous rulings by the trial court" on the proper forum for the suit. *Id.* at 718. That "aspect of the statute's retroactivity" ran "afoul of constitutional limitation," *id.*, by "invad[ing] the province of the judicial department," *id.* at 719.

*Gardner* made clear that labeling a right as "vested" does not end the constitutional inquiry. If that were the case, this Court would have stopped after so classifying the plaintiff's right to her chosen venue. Instead, *Gardner* extended the retroactivity analysis beyond "conclusory labels," focusing instead on the reasonableness of the legislative measure and its adherence to constitutional boundaries. *See id.* at 719–20.

This Court's 1988 decision in *Armstrong* endorsed *Gardner*'s logic and reaffirmed the limits of the vested rights regime. 322 N.C. at 401–02. In that case, the defendant-husband, a Marine Corps veteran, earned a military pension for his service and began receiving the pension while he was married. *Id.* at 397–98. After the couple separated, the plaintiff-wife filed for divorce and equitable distribution. *Id.* at 398. In the window between separation and divorce, the legislature amended the Equitable Distribution Act (EDA) to include military pensions in the pool of divisible

marital property. *Id.* at 400–01. The trial court applied the modified statute and ruled that the husband's pension, earned during the marriage and long before the EDA's expansion, was subject to equitable distribution. *Id.* at 399.

The husband challenged this decision, asserting that retroactively applying the amended EDA deprived him of his vested property rights. *Id.* at 400. He argued that his pension was earned long before the statutory change and that he relied on the laws in effect during his service, marriage, and separation. *Id.* To him, the amendment amounted to an unconstitutional taking without compensation. *Id.*

This Court examined this claim under the Law of the Land Clause and rejected it. *Id.* The husband's military pension, while a property interest, was not a vested right immune from legislative adjustment. *Id.* at 402. There is no absolute property interest, we explained, in an "expectation of a continuance of existing law." *Id.* The husband might have hoped to retain the full pension as allowed by past law, but the Constitution does not protect such wishes from legislative change. *See id.* at 401. Remedial statutes—like those governing property division upon divorce—are policy decisions entrusted to the General Assembly. *See id.* Applying the amended EDA to the husband's pension—earned under the earlier law—did not deprive him of a "vested right entitled to protection from legislation." *Id.* at 402.

Continuing our analysis, this Court found the amended EDA to be a reasonable and well-targeted statute in line with valid legislative goals. *See id.* at 401. The common law had left homemaker spouses—usually wives—with little to no property

rights upon divorce. *See White v. White*, 312 N.C. 770, 773–74 (1985). The EDA aimed to correct this injustice by adopting a modern view of marriage: a partnership in which both spouses contribute and deserve a fair share of property acquired during the union. *See id.* at 775; *Armstrong*, 322 N.C. at 400–01. Including military pensions in the definition of marital property advanced this purpose by ensuring equal treatment of all forms of property earned during the marriage. *See id.* at 402–03. It also aligned North Carolina's approach with changes in federal law. *See id.* at 401.

Extending the amended EDA to already-acquired property served these goals. If cabined to property secured *after* its enactment, the "full effect of the Act would not be felt for at least a generation," thus compromising its fairness and undermining its administrability. *Id.* at 403. At the same time, this Court explained, the EDA drew reasonable lines. It did not disturb ownership or restrict how spouses managed their property; it applied only after separation and upon the filing of a claim for equitable distribution. *Id.* at 401–02. This careful approach showed that the legislature acted reasonably, advancing its policy goals without overstepping constitutional boundaries.

*Armstrong* makes clear that the label of "vested rights" does not hold talismanic power. As discussed above, the *Armstrong* Court reaffirmed the legislature's authority to craft procedural and remedial measures and rejected the idea of a vested right to the perpetual shelter of past laws. *See id.* More importantly, *Armstrong* shifted the focus of the inquiry. Instead of fixating on whether a right

qualifies as "vested," the analysis now turns on whether a legislative measure reasonably serves valid public interests.

Cases since *Armstrong* have confirmed its vitality. Most recently, this Court's decision in *Lake v. State Health Plan for Teachers & State Employees* held that a class of retired state employees "enjoyed a constitutionally protected vested right" to remain enrolled in their healthcare plan. 380 N.C. 502, 504 (2022). This right, the Court explained, was shielded by the Law of the Land Clause and the federal Contracts Clause. *See id.* at 504, 531–33. But the analysis did not end after labeling the right as "vested." Instead, we recognized the need for legislative flexibility given the "rapidly changing world of dramatic medical advances and evolutions in how health care is financed." *Id.* at 505. Rather than rigidly treating vested rights as untouchable, we examined whether the state's actions were "a reasonable and necessary means of serving a legitimate public purpose." *Id.* at 530 (cleaned up). This Court ultimately remanded the case, instructing the lower courts to, among other things, "identify[ ] the actual harm the state seeks to cure" and consider "whether the remedial measure adopted by the state is both a reasonable and necessary means of addressing that purpose." *Id.* (cleaned up).

The arc of this Court's cases is striking in both content and consistency. It shows that *Wilkes County* does not convert the bare lapse of time into an absolute property right, as the Board contends. It also confirms that vested rights are not wooden barriers to legislative action. As interests covered by the Law of the Land

Clause, vested rights are "secured and protected by the law." *Charlotte Consol.*, 187 N.C. at 74 (cleaned up). Accordingly, the state may not impinge on them "unless it be by due process of law." *Id.* (cleaned up). Said differently, statutory interference with a vested right must be reasonable and in line with principles of substantive due process.

The SAFE Child Act easily surpasses that standard. To start, the right at issue here—a statute-of-limitations defense—is not fundamental. Limitations windows are procedural tools rather than substantive entitlements. As the U.S. Supreme Court has explained, they are creatures of legislative devise that "go to matters of remedy, not to destruction of fundamental rights." *Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 314 (1945). Because statutory time bars are "good only by legislative grace," they have historically been "subject to a relatively large degree of legislative control." *Id.*; *accord Campbell v. Holt*, 115 U.S. 620, 628 (1885) (rejecting argument that a limitations defense is "a vested right, so as to be beyond legislative power in a proper case" and holding that "no right is destroyed when the law restores a remedy which had been lost"). This Court has said the same. *See Rhyne*, 358 N.C. at 171 (explaining that statutes of limitations fall within the General Assembly's "policy-making authority to define legally cognizable remedies"); *Strickland*, 91 N.C. 103; *Alpha Mills,* 116 N.C. 797; *B-C Remedy Co.,* 226 N.C. 52. As policy-laden procedural tools long entrusted to legislative discretion, the shelter of a limitations defense "has never been regarded as . . . a fundamental right." *Chase Sec.*, 325 U.S. at 314 (cleaned up).

This Court therefore reviews section 4.2(b) under the rational basis standard. Because it brings a facial challenge, the Board must show that the statute lacks a rational relation to "any conceivable legitimate purpose," *see Halikierra,* 385 N.C. at 663 (cleaned up), and is therefore unlawful in all its applications, *see State v. Thompson*, 349 N.C. 483, 491–93 (1998). It has not carried this burden.

The purposes behind section 4.2(b) are not only legitimate but laudable. Protecting "children from sexual abuse" is a "substantial governmental interest" of the highest order. *State v. Packingham*, 368 N.C. 380, 388 (2015), *rev'd on other grounds,* 582 U.S. 98 (2017); *see also State v. Bishop*, 368 N.C. 869, 877 (2016) ("[W]e reaffirm that the State has a compelling interest in protecting the physical and psychological well-being of minors." (cleaned up)). The state also has a legitimate interest in giving victims a chance to seek justice. In fact, this goal is so compelling that it finds express voice in our Constitution. *See* N.C. Const. art. I, § 18 ("All courts shall be open; every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law; and right and justice shall be administered without favor, denial, or delay.").

The General Assembly carefully crafted section 4.2(b) to advance these important interests by allowing victims of abuse to expose perpetrators and the institutions that shield them. This, in turn, serves broader public goals by rooting out hidden predators, increasing awareness of abuse, and shifting the costs of abuse onto those responsible. Section 4.2(b) also aligns the law with developing knowledge and

restores a remedy unfairly lost. Legislators identified these concerns as they crafted and deliberated on the SAFE Child Act, in general, and section 4.2(b), in particular. *See* H. Deb. on S.L. 2019-245 (N.C. June 19, 2019) (statement of Rep. Dennis Riddell), https://ncleg.gov/Documents/9/1548.

Finally, section 4.2(b) employs reasonable means to achieve its valid goals. It opened a discrete window for a specific category of plaintiffs—victims of child sexual abuse—to bring claims for that abuse. It also applied to a specific type of civil action: those "for child sexual abuse" otherwise time-barred by N.C.G.S. § 1-52. Importantly, the statute does not alter substantive law or change the burden of proof. It simply gave victims a day in court by removing what the General Assembly viewed as an unintended and unjust procedural hurdle. As the House sponsor explained, section 4.2(b) provided "a two-year window of looking back"—a "one-time deal" for victims time-barred by prior law. *Id.* at 33:39.

For these reasons, I would hold that section 4.2(b)—on its face—satisfies rational basis review. It is a reasonable response to evolving knowledge about child sexual abuse—precisely the kind of policy decision entrusted to the legislature. The provision is thus facially, constitutionally permissible under the Law of the Land Clause.

The majority believes that this substantive due process analysis is "unnecessary," since the Board "chose to premise its argument on our vested rights doctrine," and the Court declined to find a vested right. *See* majority *supra* Section

III.D. In my view, though, the case before us necessarily implicates the interaction between the vested rights doctrine and the Law of the Land Clause's substantive due process protections under our precedent, for the reasons described above.

Moreover, I believe that the issue is squarely within our appellate jurisdiction on this dissent-based appeal. *See* N.C. R. App. P. 16(b); *Cryan v. Nat'l Council of Young Men's Christian Ass'ns of U.S.*, 384 N.C. 569, 575 (2023). At the Court of Appeals, the dissent disagreed with the lead opinion on how "to mesh the vested-rights doctrine with the fundamental-rights doctrine." *McKinney*, 290 N.C. App. at 441 (Carpenter, J., dissenting). So did the dissenting judge on the superior court three-judge panel. Order at 16, *McKinney v. Goins*, No. 21 CVS 7438 (Wake Cnty. Super. Ct. Dec. 20, 2021) (McGee, J., dissenting) ("[T]he Fourteenth Amendment of the United States Constitution should be used as guidance [for this challenge] because 'law of the land' is synonymous with 'due process of law.'" (cleaned up)). These opinions clearly articulate a disagreement as to the Law of the Land Clause's protections and the scrutiny required in a vested rights challenge—a disagreement which the majority sidesteps.[8]

## II.    The Majority's Flawed Approach

---

[8] It is difficult to reconcile the majority's invocation of waiver here with its simultaneous decision in *State v. Tirado*, No. 267PA21 (N.C. Jan. 31, 2025). There, the Court purports to reach an issue neither party argued on appeal and that both parties expressly disclaimed as before the Court. Here, the Court avoids an issue affirmatively argued by multiple parties on appeal and that formed a core dispute between lower courts in a dissent-based appeal.

Having explained how I would resolve this case, I now turn to the problems I see with the majority's adoption of extreme originalism, or what I will call the "*McKinney* method of constitutional interpretation." While the majority frequently cites *Harper v. Hall*, 384 N.C. 292 (2023), I do not believe the logic of its opinion follows recognizably from that case. Nor do I believe that the new *McKinney* approach adequately addresses *Harper*'s deficiencies—in fact it only serves to underscore them.

## A. *Harper v. Hall*

If the majority faithfully applied the approach it first outlined in *Harper*, then this is an open and shut case.

*Harper* instructed that "the standard of review [for a constitutional challenge] asks whether the [challenged provision enacted] by the General Assembly, which [is] presumed constitutional, violate[s] an express provision of the constitution beyond a reasonable doubt." *Harper*, 384 N.C. at 325. *Harper* continued: "When we cannot locate an express, textual limitation on the legislature, the issue at hand may involve a political question that is better suited for resolution by the policymaking branch." *Id.*

This back-bendingly deferential standard is justified, the majority explained, by the subordinate role of the judicial branch relative to the General Assembly, a branch said to be closest to the people and most accountable to them. *Id.* at 297, 321–25. In the *Harper* majority's view, ours are not coequal branches of government. *Id.* at 322 ("Nowhere was it stated that the three powers or branches had to be equal. In

fact, although the balance occasionally shifted, the preponderant power has always rested with the legislature." (quoting John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 50 (2d ed. 2013))). Rather "the General Assembly possesses plenary power" subject to "various express checks." *Id.* at 322–23.

Applying *Harper* here, the Board's claim fails easily, because nothing in the express text forecloses this act by the General Assembly. As Section III.B of the majority's opinion observes, the text of the Constitution sets two express limits on retroactive laws, beyond which the General Assembly can presumably act freely. There is no structural limitation on such an action, either, absent separation of powers concerns raised by the reopening of final judgments. *See* majority *supra* note 11. And insofar as precedent "confirm[s]" this plain language interpretation, *see Harper*, 384 N.C. at 363, Founding-era and Reconstruction-era cases show that the General Assembly may act retroactively outside of the two narrow express constitutional limits. *See* majority *supra* Section III.B. Case closed.

Notice that *Harper* leaves no space for *Wilkes County*'s conflicting view of retroactivity or the vested rights doctrine. As the dissenting judge at the Court of Appeals speculated, under *Harper*, *Wilkes County* should perhaps be overruled or else disregarded entirely "[g]iven its lack of support from the text of our state Constitution." *See McKinney*, 290 N.C. App. at 442 (Carpenter, J., dissenting) (citing *Harper*, 384 N.C. 292). The vitality of the "vested rights" doctrine as a limitation on the General Assembly's ability to act is dubious, since the words "vested right" do not

appear in the express constitutional text, which permits interferences with life, liberty, and property by the "law of the land," and since any violation must be proved "beyond a reasonable doubt." *See Harper*, 384 N.C. at 323.

The problems with *Harper*'s approach are obvious and perhaps help to explain why the Court abandoned it here. To start, *Harper* has no meaningful role for precedent. How could it? *Harper* itself abandoned existing precedent that was "erroneous" or "wrongly decided" in the view of the Court's new personnel. *Id.* at 373, 374. Instead, *Harper* instructs that precedent is analytically useful to the extent it "confirm[s]" the plain language of an express textual provision. *See id.* at 363. But that circular reasoning offers jurists and advocates little guidance. It cannot be true that precedent constrains a court's decision-making if a court only invokes precedent to support its outcome, only to "confirm[ ]" the historical and textual account. *See id.* Put another way, precedent is not a constraint on judicial decision-making if it never actually constrains. And if it cannot constrain, then it has little analytical use; it can only decorate the predetermined outcome.

And what is to be done with precedent that did not follow *Harper*'s approach to constitutional interpretation (as in, the cases that preceded it for hundreds of years)? *Harper* does not say. Nor can it make sense of conflicting precedent on limitations that are not express—for example, it cannot resolve how the Court should harmonize *Hinton* and *Wilkes County* to parse the scope of the judicially implied vested rights doctrine. *Harper* left no space for such implied rights at all.

That means *Harper* offers perilously weak protections for individual constitutional rights against legislative interference. Again, the words "vested rights" do not appear in the text of the Constitution. The text of the Law of the Land Clause does not tell an ordinary reader its scope, it is up to judges to spell it out. Yet *Harper* treats old precedent as the ceiling of protections for constitutional rights. This is deeply flawed, because "[t]he cases that have happened to rule on a specific and limited issue do not, without more, define the entire scope of a constitutional provision." *Id.* at 394 (Earls, J., dissenting). Applying *Harper* here thus has concerning implications, because older precedents offer little protection against most civil retroactive legislation.

## B. The *McKinney* Method

Perhaps appreciating *Harper*'s manifold shortcomings, the majority makes frequent citations to *Harper* while inventing a new approach.[9]

To summarize the majority's analytical structure: it starts by emphasizing the presumption of constitutionality and that our Court may only strike an act of the legislature if it violates an express constitutional limitation beyond a reasonable

---

[9] The majority actually makes frequent citation to three cases from 2023, implying that its new approach extends from those three cases. *See, e.g.*, majority *supra* Section II.A ("Our review presumes that legislation is constitutional and that a constitutional limitation on the General Assembly must be explicit in the text and demonstrated beyond a reasonable doubt." (first citing *Harper*, 384 N.C. at 323; then citing *Cmty. Success*, 384 N.C. at 212; and then citing *Holmes v. Moore*, 384 N.C. 426, 435–36 (2023))). But the majority's opinion is really about cleaning up *Harper*. Just look to the parties' briefs. Of those that mention any of these three cases (the State's does not), the Board's briefs do not mention *Holmes*, and plaintiffs' brief relies on a single quote from *Holmes* and makes only a passing reference to *Community Success*.

doubt. *See* majority *supra* Part II. At the same time, it string cites cases preceding *Harper* to show that "express constitutional" limitations also include those that exist by "necessary implication," citing *Lee v. Dunn*, 73 N.C. 595, 601 (1875), and *Berger*, 371 N.C. at 810–11. So "express limit" apparently means "express and implied" limits.

Then, the majority detours into a discourse on judicially implied constitutional protections for vested rights, concluding that an elapsed statute of limitations is not one and largely ignoring our Law of the Land Clause doctrine since the 1980s. *See* majority s*upra* Section III.A. It next returns to the constitutional text, to observe by the final third of its opinion that the express text of Article I, Section 16 "implies that the General Assembly may enact retroactive legislation that does not fall into these two prohibited categories—that is, retroactive civil laws that do not impose taxes." *See* majority *supra* Section III.B. Talk about burying the lede.

Finally, the majority returns to judicial precedent on vested rights only to dispense with the Board's key case as dicta and to further disclaim any relevance of the substantive due process analysis.[10]

---

[10] It is important to note that the Board's "vested rights" argument was entirely predicated on its assertion that "fundamental rights [for substantive due process] *can* be impaired or taken away by the government under certain circumstances. Not so with vested rights, which are immune to infringement by the Legislature." That distinction between fundamental rights and vested rights, the Board contended, makes the balancing framework of the Fourteenth Amendment "particularly inappropriate in the context of North Carolina's vested rights doctrine." Of course. There is nothing to balance if the interference is categorically prohibited. The majority seems to implicitly acknowledge that we have abandoned this categorical view of vested rights, by noting that this Court's eminent domain precedent permits certain interference with vested rights to freehold interests in real property. *See* majority *supra* note 6.

How the majority can present this circuitous reasoning as consistent with *Harper*'s "express text" dogma is a puzzle.

Another puzzle is which text and whose understanding of it actually matters. In *Community Success*, this Court opined that "the [constitutional] provision's meaning at the time of its ratification" was the relevant inquiry. 384 N.C. at 213. The normative justifications for that approach presumably sounded in judicial populism: *Harper*, announced the same day, declared that "judicial interpretations of [the Constitution] should consistently reflect what the people agreed the text meant when they adopted it," not any meanings derived by "the most astute justice or academic." 384 N.C. at 297. The *Community Success* Court relied in part on the ratification of the 1971 Constitution when it dismissed a challenge to a law governing how people with felony convictions can regain the right to vote, a law that a trial court had determined to be racially discriminatory. *Id.* at 224, 229. The Court observed that the 1971 ratification was a "historic development" that provided explicit equal protection and nondiscrimination guarantees for the first time in our state Constitution. *Id.* at 224.

Accordingly, here the Board invoked original public understanding of the

---

The Board took no issue with the appropriateness of our longstanding caselaw interpreting the Clause's protections for fundamental and nonfundamental rights consistent with the substantive due process protections of the Fourteenth Amendment. *See e.g.*, *Rice v. Rigsby*, 259 N.C. 506, 518 (1963) ("The words 'the law of the land' as used in section 17, Article I of the North Carolina Constitution are equivalent to the words 'due process of law' required by section 1 of the Fourteenth Amendment to the United States Constitution.").

Clause at the point of ratification. It argued that no one would have thought the legislature had the ability to revive an elapsed statute of limitations when the Constitution was ratified in 1971, based on the language in *Wilkes County* and the cases that cited it.

But the *McKinney* method rejects this approach. The majority corrects that it is not the text as ratified and understood by ordinary North Carolinians that matters, or even what lawyers would have thought based on language in relevant cases. It ignores any notions of public understanding of the Clause during the 1971 ratification. *McKinney* instead asks about the intentions of the constitutional drafters from centuries back, since that is when the Law of the Land Clause first appeared and since its text is largely the same. *See* majority *supra* note 5.[11]

Note that the normative justifications of the *McKinney* method, if there are any, are not specified. That is perhaps not a coincidence. Scholars of many stripes have long recognized that it is untenable for a present generation to be "legally bound to obey another's mere wish or thought." Laurence H. Tribe, Comment, *in A Matter of Interpretation* at 66. Yet that is what results when constitutional interpretation devolves into "imaginative legal anthropology" about what landholding white men in "an eighteenth-century agrarian society . . . would have thought in situations within

---

[11] Counsel for the Board was not alone in misapprehending the interpretive task. Apparently, none of the jurists on the initial three-judge panel, nor the three jurists on the Court of Appeals panel, correctly applied the supposedly "fundamental approach by which this Court has decided constitutional questions for over two centuries." *See* majority *supra* Part II.

which they would have been, of course, very different people." Philip Bobbitt, *Constitutional Fate: Theory of the Constitution* 23–24 (1982). Even Justice Scalia resoundingly rejected this kind of originalism. Scalia, *A Matter of Interpretation* at 133 (agreeing with Professor Tribe that "we both regard as irrelevant the intentions of the drafters"). Indeed "most originalists . . . long abandoned original intention," because "surely it was the ratifiers' views that counted because only they had the authority to make the proposed Constitution law." Jack M. Balkin, *Original Meaning and Constitutional Redemption*, 24 Const. Comment. 427, 442, 445 (2007).[12]

How do we know the intent of the early constitutional drafters? Sources of evidence include a book written by the same justice who pens the majority opinion and legislative history, like a report from the North Carolina State Constitution Study Commission. Decisions by this Court from centuries past are also probative, but unfortunately, the *McKinney* method still offers little instruction on how to harmonize early precedent with later—if that matters at all.

The *McKinney* approach is inconsistent with the majority's own decisions in *Community Success* and *Harper*, it is more extreme than modern originalism and

---

[12] I do not mean this point to convey my support for other forms of originalism. While historical understandings, where they exist, can be a helpful consideration for constitutional interpretation, they are certainly not the only or even predominate mode of interpretation, and they are vulnerable to many challenges. *See, e.g.*, Jack N. Rakove, *Original Meanings* 6 (1996) (noting that, from the outset, the Federal Constitution's framing and ratification "reflected a bewildering array of intentions and expectations," such that assertions of "some fixed and well-known meaning" at the moment of adoption invariably "dissolve[ ] into a mirage").

normatively unjustified, and it is premised on historical inaccuracy. The majority reasons that it is justified in its anthropological quest as to the intentions of the drafters of the 1776 constitution, because nothing new happened in 1971. This reasoning does not withstand the slightest scrutiny.

To start, the 1971 constitutional ratification was indeed a historic development. The 1968 North Carolina State Constitution Study Commission was the third such commission that century to attempt much needed revisions to the State's Constitution. *See Report of the North Carolina State Constitution Study Commission* 4 (1968). Like those commissions before it, it determined that our foundational text had to be rewritten as a whole given the numerous and interrelated necessary changes. But where other commissions failed by trying to consolidate all "recommendations into a single revised constitutional text which the General Assembly and the voters would have to approve or disapprove as a unit," the new commission framed its work as "a series of ten interrelated but mutually independent amendments for submission to the General Assembly and the voters of the State." *Id.* Breaking the "take it or leave it" approach was key to the effort's success. The first such amendment was a "general editorial revision" full of "deletions, reorganizations, and improvements in the clarity and consistency of language." *Id.* But even these changes were "substantive" and "important," and indeed the commissioners believed "that the work of this Commission will have been justified if this proposal alone is approved by the General Assembly and the voters." *Id.*

These "editorial amendments" were coupled with a set of nine other "fundamental and substantive changes in the form of separate amendments." *Id.* Among the proposals were new requirements for the judiciary, like a mandatory retirement age and procedures for discipline; measures that strengthened the power of the Governor, like the veto power and the ability to run for successive terms; changes to voter eligibility requirements and jury trial rights; and substantial changes to the organization of administrative agencies in the executive branch; and changes to the mode and selection of state executive officers. *Id.* A further amendment recommended substantial changes to provisions of the Constitution affecting local government finance. *Id.* at 5. Not all recommendations were adopted, but many of them were, as were others independently put forward by the General Assembly concurrent with the proposed constitution and in the years that followed. *N.C. State Bar v. DuMont*, 304 N.C. 627, 636–39 (1982).

Contrary to the majority's assertion, the "editorial" changes in the proposed constitution were noncontroversial precisely because the Commission made clear that although "[s]ome of [those] changes are substantive, . . . ***none is calculated to impair any present right of the individual***." *Report of the North Carolina State Constitution Study Commission* 4 (emphasis added).

The revisions were strictly rights additive. The proposed constitution offered to strengthen the Declaration of Rights, by making it clear that the rights secured by that article are "commands and not merely admonitions to proper conduct on the part

-81-

of the government." *Id.* at 30. The commission recommended keeping in the Declaration of Rights not only those provisions addressing problems "fresh and meaningful to its authors of 1776 and its revisors of 1868," but also "similar guarantees of a more current character," like freedom of speech, guarantee of equal protection, and prohibition of improper discrimination. *Id.* These new guarantees helped to "augment" the "ancient guarantees of liberty" in earlier versions of our foundational document that were continued into the new Constitution. *Id.* (citing as examples prohibitions against the quartering of troops in private homes and imprisonment for debt). Further, the commission recommended removing provisions that were "clearly invalid because [they were] contrary to the Constitution of the United States." *Id.* at 29. Times had changed since 1776. North Carolina's new constitution recognized as much and sought to "lay down general principles of government which must be observed amidst changing conditions." *Id.* at 1 (cleaned up). In particular, this forward-looking document endeavored to "protect the rights of the individual from encroachment by the State." *Id.* (cleaned up).

All such changes in the proposed constitution were adopted. *DuMont*, 304 N.C. at 636–37. Indeed our caselaw has recognized that the new constitution's revisions ranged from editorial to substantive, and thus we have taken a case-by-case approach to interpreting them. *See id.* (rejecting an argument that "all rights to jury trial recognized at common law and provided by statute at the time the 1970 Constitution was adopted are now of constitutional dimension" and clarifying that art. I, § 25's

changes were editorial only with respect to the challenged issue (emphasis omitted)).

The majority belittles these historic changes. It reasons that the historical context of the "editorial revisions" shows the drafters "were updating the constitution's words to ensure that its modern meaning remained consistent." *See* majority *supra* note 5. Thus the historical context of the *earlier* constitutional provisions is what controls. This reasoning is circular. It only begs the question to assert that the drafters intended to keep the Clause's meaning consistent. What meaning is that? How do we know?

Moreover, the majority's own evidence belies its assertions. The very sources it cites show that the proposed constitution intended to preserve rights that existed, under this Court's precedent and under federal law, at the time the 1971 Constitution was proposed and ratified. Indeed, the commission's report reveals that it understood the new Constitution to, in many cases, incorporate contemporary understandings of the relevant provisions as developed by our Court. *E.g.*, *Report of the North Carolina State Constitution Study Commission* 32 (citing *Sykes v. Clayton*, 274 N.C. 398 (1968) for our Court's clarification as to the meaning of the phrase "other subjects" in the taxing part of art V, § 1); *id.* at 33 (citing what "[t]he State Supreme Court says" about art. VI, § 6's provisions on the eligibility to office and relying on that meaning to inform its recommended substantive changes). Incorporating these existing judicial interpretations would have helped the 1971 drafters and ratifiers to "consolidate the gains of the prior hundred years and to introduce a number of much needed reforms,"

as the author of the majority opinion put it. *See* Orth & Newby, *State Constitution*, at 4. The majority cites no evidence to support that the 1971 constitutional framers or ratifiers understood themselves as re-enacting *historical* understandings of the operative provisions. The majority, then, is using historical context merely as a tool for cloaking its own subjective judgments about the proper way to interpret our Constitution, its values, and the rights it protects.

### III.    Conclusion

In sum, I understand *McKinney* to partially clean up *Harper*, underscoring that earlier case's deficiencies while failing to adequately address them. The majority's new interpretive quest is to divine the intent of constitutional drafters from many centuries past through legislative history and secondary sources. Precedent apparently matters more under *McKinney* than under *Harper* as a source of meaning, even as we are still not sure precisely how. Older precedents appear to be more persuasive than newer ones, and the same is true of versions of our constitution.

For the reasons I explain here, I do not believe that the *McKinney* method provides a workable theory of constitutional interpretation—let alone one that could be enshrined as "the methodology by which we evaluate a constitutional challenge." *See* majority *supra* Section II.B. It is an extreme ideology with devastating consequences that is not supported by this Court's precedents beyond the current majority's endorsement. Because of my strong objections to the Court's revolutionary and radical adoption of originalism and the future threats to constitutional rights it

signals, I concur in the result only.